■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CYRIL GRIFFITH, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County (Grajales, J.), rendered July 5, 1989, convicting him of criminal sale of a controlled substance in the third degree (two counts), upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed, and the matter is remitted to the Supreme Court, Kings County, for further proceedings pursuant to CPL 460.50 (5).

We find unpersuasive the defendant's contention that the prosecution's evidence was not of adequate quantity or quality to sustain his conviction. Viewing the evidence in the light most favorable to the prosecution *(see, People v Contes,* 60 NY2d 620), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, resolution of issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the jury, which saw and heard the witnesses *(see, People v Gaimari,* 176 NY 84, 94). Its determination is entitled to great deference on appeal and should not be disturbed unless clearly unsupported by the record *(see, People v Garafolo,* 44 AD2d 86, 88). Upon the exercise of our factual review power, we are satisfied that the verdict was not against the weight of the evidence *(see,* CPL 470.15 [5]).

It is obvious from the verdict that the jury, which had the opportunity to view the witnesses, hear their testimony and observe their demeanor, found the People's witnesses credible and the defendant and his alibi witnesses, i.e., his mother, his sister and his girlfriend, not credible. Our dissenting colleague concludes that the weight of the evidence in this case supports a reversal, relying upon the considerations that this is a single eyewitness case, that the eyewitness described the defendant's jacket as maroon when she first saw him and as black, white and red when she subsequently observed him, that no drugs or prerecorded money were found on the defendant's person at the time of his arrest, and upon a finding that "the nearly uniform time sequences" testified to by the police witnesses

are "somewhat doubtful". None of these factors justifies disturbing the jury verdict. Criminal prosecutions based upon the testimony of a single eyewitness are hardly rare, as those who engage in criminal conduct generally do not do so before an audience. Of far greater significance is the consideration that the single eyewitness in this case was a trained and experienced undercover police officer who spent some 3 to 3½ minutes in the close company of the defendant and who therefore had an excellent opportunity to view him *(see, People v Wharton,* 74 NY2d 921; *People v Morales,* 37 NY2d 262; *see generally, People v Petralia,* 62 NY2d 47, *cert denied* 469 US 852). The failure of the undercover officer to mention the defendant's West Indian accent and the large gap in his front teeth in the description she relayed to the backup team is of no moment given that neither of these items of information would have assisted the backup officers in spotting the defendant on the street. The identification testimony of the undercover officer at trial was consistent and unwavering, and the jury was certainly entitled to credit it. That the undercover officer described the defendant's jacket as maroon when she first observed him and then as black, white and red when she next saw him some time later does not warrant a departure from the jury's determination of guilt. The jurors reasonably could have concluded that the officer either was initially mistaken in her description or that the defendant had procured a different jacket during the 15-to-20 minute interval between his sale of drugs and his arrest.

Likewise, the fact that no drugs or prerecorded money were recovered from the defendant fails to persuade us that the verdict rendered by the jury is erroneous. Indeed, it is observed in the dissent that the purchase of cocaine by the undercover officer exhausted the defendant's supply of the drug. Hence, the absence of drugs at the time of his arrest is hardly shocking. Moreover, given the length of time between the defendant's commission of the crime and his arrest, the lack of prerecorded money on his person did not mandate a verdict of acquittal.

Furthermore, the defendant's alibi evidence is far from convincing. While the defendant's mother, sister and girlfriend maintained that he did not leave his residence until 5:30 P.M., the backup police officers testified that the defendant had been placed under arrest no later than 4:30 P.M. The testimony of the backup officers as to the time frame was entirely consistent with the undercover officer's testimony and directly contradicted the defendant's alibi witnesses. Unlike

our dissenting colleague, we do not find the police testimony in this regard to be "somewhat doubtful" because of its uniformity, as police officers are obligated, as a matter of training and duty, to note relevant time periods. Rather, it is the alibi testimony presented by the defendant which is rendered doubtful by its uniformity. Indeed, each of the defendant's three alibi witnesses stated that she fortuitously looked at the kitchen clock at the moment the defendant left his residence; hence, each was sure that he left at 5:30 P.M. We find no difficulty in the jury's apparent rejection of this seemingly tailored testimony. Similarly, we do not share the dissent's skepticism regarding the ability of the backup officers to complete a thorough search of the crime scene within the period of an hour before transporting the defendant to the station house.

In sum, all of the issues raised by the dissent were placed before the jury at the defendant's trial, and the jurors resolved each issue in favor of the prosecution. Our dissenting colleague, on the other hand, has resolved each issue in favor of the defendant. As the Court of Appeals noted in *People v Gaimari* (176 NY 84, 94, *supra):* "[the jurors] could look into the faces of the various witnesses as they gave their versions of the transaction and decide, so far as human judgment can tell, not only who intended to speak the truth, but who in fact spoke the truth. Representing the average judgment of mankind, they could separate the true from the false with a degree of accuracy which, according to the theory of our law founded on the experience of many generations, cannot be attained by reviewing judges. The memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by those who see and hear than by those who simply read the printed narrative." Inasmuch as the jury in this case has rendered a verdict which is entitled to great deference and which we do not find to be against the weight of the evidence *(see generally, People v Bleakley,* 69 NY2d 490), we decline to disturb that verdict.

Similarly unavailing is the defendant's contention that the evidence adduced by the prosecution failed to sufficiently establish the chain of custody for the narcotics which were admitted into evidence. The trial testimony demonstrated that the narcotics were placed in an envelope by the undercover officer who purchased them from the defendant, and that the envelope was then sealed, marked and signed by that officer and by her supervisor, who placed it in a safe. Moreover, the

police laboratory chemist testified that he received this envelope in an intact and sealed condition, thus providing "reasonable assurances of the identity of the narcotics and of their unchanged condition" *(People v Newman,* 129 AD2d 742; *see, People v Wilson,* 150 AD2d 628). Moreover, we note that to the extent the defendant claims the existence of a gap in custody *subsequent* to the laboratory analysis, "there was no possibility that [such a] gap would have permitted any *prejudicial* alteration of the contents of the drugs initially seized" *(People v Julian,* 41 NY2d 340, 344).

The defendant's claim regarding the court's denial of a *Wade* hearing in this case, has not been properly preserved for our review. However, if we were to consider it, we would find it lacking in merit *(see, e.g., People v Davis,* 141 AD2d 831).

We have considered the defendant's remaining contentions and find them to be without merit. Thompson, J. P., Sullivan, and Harwood, JJ., concur.

Miller, J., dissents and votes to reverse the judgment and to dismiss the indictment, with the following memorandum: I must respectfully dissent as I find that the weight of the evidence fails to support the jury's verdict.

In contrast to a challenge to the legal sufficiency of the evidence, which requires the court to view the evidence in a light most favorable to the prosecution, giving it the benefit of every favorable inference to be drawn therefrom *(see, People v Contes,* 60 NY2d 620), the defendant's contention that the jury's verdict is against the weight of the evidence requires an examination of all of the evidence without according favorable treatment to either party in order to determine if the jury was correct in its factual findings of guilt *(see,* CPL 470.20 [5]; *People v Bleakley,* 69 NY2d 490). This factual analysis involves the weighing of " 'the relative probative forces of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' * * *. If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict" *(People v Bleakley, supra,* at 495). Overturning the findings of the trier of fact is not to be done lightly *(People v Bleakley, supra,* at 495; *People v Cheatham,* 153 AD2d 566). Nevertheless, where the fact findings are "manifestly erroneous" or "so plainly unjustified by the evidence that the interests of justice necessitate their nullification", the Appellate Division may reverse the conviction as contrary to the weight of the evidence *(People v Garafolo,* 44 AD2d 86, 88; *see, People v Gaimari,* 176 NY 84). In the instant

case, because I find that a jury verdict of acquittal would not have been unreasonable and because my assessment of the weight of the evidence raises some glaring deficiencies in the People's case, it is my opinion that the jury verdict should be set aside.

In the case at bar, two competing versions of events war with one another. The police contend that the defendant is the individual who sold drugs to an undercover officer on a Brooklyn street. Only the identification of the defendant proffered by the undercover officer, Officer (now Detective) Johnson, linked the defendant to the alleged criminal activity. The defendant and his witnesses, on the other hand, claim that the defendant was at home at the time of the sale, and was mistakenly identified and arrested as he innocently walked past Officer Johnson moments after the sale.

The instant so-called "buy and bust" operation was conducted in the vicinity of Franklin Avenue and Park Place in Brooklyn on April 11, 1988. After receiving prerecorded money from her backup team, Officer Johnson set out to purchase drugs on the street. Officer Johnson testified that at approximately 4:00 P.M., she purchased two $5 vials of cocaine from the defendant on Franklin Avenue. Because the defendant reportedly had no more cocaine to sell, Officer Johnson then walked with him to nearby Park Place to purchase two more vials from another suspect, spending a total of approximately 3½ minutes in the defendant's company. She returned to her vehicle and radioed a description of the defendant and the second suspect to her backup team, which was parked around the corner. In this first radio call, Officer Johnson said she described the suspect as a male black, wearing a maroon jacket, dark pants and dark shoes, ascribing to him the name "J.D. [John Doe] Maroon". At no time did Officer Johnson make any notes of the suspect's appearance. Significantly, neither of her backup officers could recall Officer Johnson's original description of the suspect. Unlike Officer Johnson, both backup officers made contemporaneous notes which, however, they testified they lost or destroyed. None of the officers, each of whom had participated in hundreds of such operations, had independent recollections of the facts at issue. Rather they relied on their official reports and paperwork completed later at the precinct house. The officers admitted that their reports were written at times ranging from several hours to as much as one week after the defendant's arrest. Many of the reports were undated. None of the reports men-

tioned an initial call describing the suspect as wearing a maroon jacket.

After receiving Officer Johnson's initial call, the backup team proceeded to an address on Park Place, the situs of the second drug sale to Johnson, where they arrested four individuals. One of them matched Johnson's description of the second suspect but the backup team could not find a man in a maroon jacket. They reported this finding by radio to Officer Johnson, who remained in her car, one block away.

Immediately upon learning that her suspect was nowhere to be found, Officer Johnson apparently fortuitously looked up from behind the wheel and saw the defendant walking on the opposite side of the street. She was able to identify him as the suspect, although he was now wearing a black, white and red jogging jacket. Radioing again to the backup team, Officer Johnson reported the defendant's changed attire and also, apparently for the first time, reported that the defendant sported a moustache and goatee. It was apparently at this point that Officer Johnson changed her written notation describing the defendant's altered attire as she now referred to him by the name "J.D. Black". According to Sergeant English this was Officer Johnson's third call to the backup team. Following the defendant by car for half a block, she observed his subsequent arrest. She did not see the defendant again until she identified him in the viewing room of the precinct house at 6:30 P.M.

When the defendant was arrested, by the police account approximately 15 to 20 minutes after the purchase, he was not found to be in possession of any drugs, any prerecorded money or any other items that might have linked him to drug selling. In fact, he was found in possession of only $5.

The defendant testified in his own behalf, along with his mother Winefred, his sister Wilma and his girlfriend Linda Davis. He and his family produced undisputed and documentary evidence that the defendant, a then unemployed driver with a good history of employment, had gone that morning to the New York State Department of Labor to look for work. He returned to his home at 2 P.M., where he remained for most of the afternoon. Linda Davis arrived at the defendant's house at 5:00 P.M. and at 5:30 P.M., she left with the defendant, who walked her to her subway stop, and then he proceeded to walk to another subway line to visit a sick friend in Mt. Sinai Hospital. Davis, a claims manager employed by Blue Cross Blue Shield for 19 years, testified that she had known the defendant for four years. She loaned him $5 so he could visit

his friend. Concededly the defendant was arrested walking in the direction of and on the streets he needed to traverse to get to the train at Eastern Parkway. In contrast to the police, who recorded the defendant as having been arrested at 4:30 P.M., the defendant and his family maintained that the arrest occurred after 5:30 P.M., perhaps at 5:40 P.M. This was a noteworthy difference between the two versions of events. It was, however, uncontroverted that the defendant had no prior arrest record, either in this country or in Barbados. He lived at home with his parents and five brothers and sisters, and defense witnesses averred that the defendant did not use or sell drugs.

After approximately two hours of deliberations, the jury sent the Trial Justice a note stating that it was deadlocked. The Trial Justice did not give an *Allen* charge but instructed the jury to continue deliberating. Later in the afternoon, the jury returned a verdict of guilty, convicting the defendant of both counts of criminal sale of a controlled substance.

Among the somewhat glaring factual discrepancies in this case, Officer Johnson's second (or third) description of the suspect left much to be desired. The only contemporaneous documentation of the defendant's description was her notation "J.D. Maroon", changed to "J.D. Black" on the manila envelope. In her subsequently filed report, Officer Johnson never mentioned the switch in jackets. Officer Johnson never wrote down a description of the facial hair of the suspect until several hours after the arrest. Significantly, while both Larkin and English testified at trial that Officer Johnson's final radio call mentioned a goatee, their testimony taken at an earlier hearing made no reference to a goatee.

Furthermore, Officer Johnson's description of the suspect in the second call was sparse, omitting distinguishing features of the defendant's appearance at the time of his arrest. Officer Johnson stated that the defendant was wearing a jogging jacket and dark blue or black pants. In actuality, he wore a black jogging suit, produced at trial, with black pants with a red stripe running down the side matching his black, white and red jacket. Officer Johnson did not mention this in her reports or trial testimony. Furthermore, Officer Johnson never mentioned, by radio or subsequent report, the distinctive West Indian accent of the defendant, who had immigrated to the United States in 1984 at the age of 28 or the unusually large gap in the defendant's front bottom teeth.

Both Larkin and English, after refreshing their recollec-

tions, remembered the final description call by Officer Johnson, although they could not remember her first description transmitted only minutes earlier.

In addition, the nearly uniform time sequences adopted by the police officers depict police economies of movement and action which I find somewhat doubtful. Officer Johnson said she made the drug purchase between 4:00 P.M. and 4:10 P.M. in the afternoon and that within 15 minutes she again spotted the defendant on the street resulting in his arrest by 4:30 P.M. Backup team members Larkin and English agreed that the defendant was arrested no later than 4:30 P.M. and placed in a police van with the four suspects who had been earlier arrested. He was not transported to the station house, however, until 5:15 P.M., arriving there at 5:30 P.M. Both officers maintained that the transportation delay was occasioned by their thorough, hour-long search and securing of the premises at Park Place, to which they returned after arresting the defendant. Yet, the length of time required for such a search as described by the officers is hardly consistent with the stated departure time of the van at 5:15 P.M. for the precinct. I infer that at the very least, arrival at the precinct may have been much later than the officers indicated. A later arrival is also more consistent with Officer Johnson's testimony that she did not view the defendant at the precinct until 6:30 P.M., and is more in line with the testimony proffered on behalf of the defense.

Moreover, the particular reports and paper work from which the police testified at trial do not inspire total confidence. Admittedly they were written well after the arrest, perhaps as long as a week later. Many are undated, so there is no telling when they were completed. Most important, salient discrepancies in the undercover officer's observation of the defendant as well as noteworthy characteristics of the defendant are omitted from the reports, i.e., the two different radio descriptions of the defendant, his purported switch in clothing, and his prominent accent.

The foregoing facts lead me to conclude that a reasonable doubt exists as to whether Officer Johnson's identification of the defendant was mistaken. As indicated, the defendant's background is inconsistent with that of a more typical cocaine dealer. He had no criminal record and a generally solid employment history. He comes from an obviously supportive family whose testimony strongly suggested that the defendant was neither a drug user nor a drug seller. The probation report prepared for sentencing indicated that the defendant

was not "street wise," that he had visible means of support, and was a "socially productive individual" who came from a "close knit", stable environment. It is also significant to me that the defendant rejected a plea bargain which could have resulted in a sentence of 1 to 3 years, the minimum allowed under law.

These facts, coupled with the rather tenuous identification testimony, lead me to believe that the defendant was truthful in his exculpatory version of events, whereas Officer Johnson may well have been mistaken in her identification. Moreover, as demonstrated above, my weighing of the evidence does not rest upon speculation and surmise, but upon an evaluation of the evidence which, in my opinion, accurately acknowledges the existence of significant inconsistencies in the People's case which may have resulted in the conviction of an innocent man. All of the foregoing considerations, accordingly, lead me to conclude that the judgment of conviction should be reversed as being against the weight of the credible evidence and the indictment dismissed.