**Larry FOX, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Odell W. FOX, Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

Nos. A–5331, A–5337.

Court of Appeals of Alaska.

Dec. 22, 1995.

Hearing Denied Feb. 20, 1996.

---

G. Blair McCune, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant Larry Fox.

Leslie A. Hiebert, Assistant Public Advocate, Brant McGee, Public Advocate, Anchorage, for Appellant Odell W. Fox., Jr.

Cynthia L. Herren, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

BRYNER, Chief Judge.

Larry Fox was convicted by a jury of two counts of misconduct involving a controlled substance in the third degree, in violation of AS 11.71.030(a)(1); the same jury convicted Larry Fox's brother, Odell W. Fox, Jr., of one count of the same crime. The Foxes appeal, contending that their convictions were obtained in violation of the Posse Comitatus Act, that their indictment was based on insufficient and improper evidence, and that certain exhibits were admitted at trial without adequate foundation. We affirm.

In mid-July 1993, T.B., a soldier at Fort Richardson, tested positive for THC and cocaine during a urinalysis. As a result, the Army decided to pursue military charges against him. T.B. agreed to act as an informant in exchange for favorable testimony at his court martial about his cooperation. T.B. informed the Army's criminal investigation division (CID) that he had purchased the drugs off-post from civilians who were selling cocaine to active duty military personnel. Specifically, T.B. named two individuals, Eldridge Bradley and Jessica Brees, who had sold him cocaine at an apartment located on Peterkin Street in Anchorage.[1]

Based on T.B.'S information, CID Special Agent John T. Kohler called Sergeant William Miller of the Anchorage Police Department (APD), informed Miller of the information T.B. had given CID, and asked if APD would be willing to pursue T.B.'s civilian drug sources. Miller, however, felt that

---

1. T.B. also described a third supplier, an unidentified woman who resided on North Hoyt Street and who played no role in the events that led to the appeal in this case.

APD did not "have people that fit a military profile [and] that know the military jargon[.]" So he asked Kohler for CID's assistance in investigating the case.

Kohler subsequently sought formal authorization from the Department of Defense for CID and APD to conduct a joint off-post drug investigation targeting Bradley, Brees, "and their associates." [2] Two days later, he received a memorandum of approval from CID headquarters.

Pursuant to this authorization, T.B. and an undercover CID investigator named Eric Weeks went to 3407 Peterkin Street—under surveillance by CID and APD personnel—to attempt to purchase cocaine from Eldridge Bradley and Jessica Brees. Brees and an unidentified man were there, but Bradley was not; Brees told T.B. that Bradley was gone and would not be back for a couple of days and that she had no cocaine to sell. Brees' unidentified companion then told Weeks and T.B. that they could obtain drugs at a nearby apartment on North Price Street. According to Weeks, the man referred to the North Price Street apartment "as being a location where Bradley normally hung out where he dealt drugs from. One of his locations. And that we could obtain drugs from that location also." T.B. immediately said he knew exactly where the apartment was, and Weeks and T.B. left Brees' apartment.

After leaving the Peterkin Street apartment, Weeks radioed his CID supervisor, Kohler, to obtain authorization to proceed to the North Price Street apartment; Weeks was told that he could go to the new address as long as he knew the people there were associated with Bradley and Brees.

On the porch outside the North Price Street apartment, Weeks and T.B. encountered Larry Fox, who evidently suspected the men of being police officers and called out a warning to Odell Fox, who was inside. T.B., however, walked up to the door, saying, "No, man, you know me, I've been here before." Odell emerged from the apartment and assured Larry that he remembered T.B.

The men then entered the apartment. Once inside, T.B. and Weeks asked to buy cocaine. After asking both men if they were in the military and being assured that they were, Larry sold them a small quantity of cocaine.

Over the next several days, Weeks and T.B. returned to the North Price Street apartment on two further occasions and purchased additional cocaine from Larry Fox. One other time, Weeks went to the apartment without T.B. and purchased cocaine from Odell Fox. On each occasion, Anchorage Police Officers worked jointly with CID personnel in monitoring the transactions. The drugs purchased by Weeks and T.B. were turned over to APD for testing, which confirmed the presence of cocaine. Based on these transactions, the state charged Larry and Odell Fox with the offenses that give rise to the present appeal.

Prior to trial, the Foxes moved to suppress evidence and dismiss their charges. Alleging that Army CID personnel who participated in their case had no legitimate military purpose and acted merely to assist civilian authorities, the Foxes argued that the evidence against them had been obtained in violation of the Posse Comitatus Act. Following an evidentiary hearing, Superior Court Judge Mark C. Rowland denied the motion, concluding in part that

> there was an independent military purpose which justified the participation of these military personnel in the investigation which led in the natural and ordinary course of the investigation to the defendants, the discovery of their criminal activity in which the military had a real and substantial interest, and ultimately to their subsequent prosecution.

On appeal, the Foxes renew their Posse Comitatus Act claim.

The Posse Comitatus Act finds form in 18 U.S.C. § 1385, which provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully

---

**2.** The request stated that the purpose of the investigation was "to attempt to identify soldiers who are involved in using, buying, or distributing drugs from the above targets, and to effect the arrest of the targets who are the immediate source of illegal drugs for soldiers stationed at Fort Richardson, AK, or introducing controlled substances onto Ft. Richardson."

uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

▮ The primary purpose of this provision is "to maintain the traditional balance of authority between civilians and the military." *Moon v. State*, 785 P.2d 45, 47 (Alaska App. 1990) (quoting H.R.Rep. No. 71, 97th Cong., 1st Sess., pt. 2, at 3 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1785, 1785). Nevertheless, in 1981, Congress, perceiving a growing drug problem of national proportions, emphasized the need "to maximize the degree of cooperation between the military and civilian law enforcement" to stem the influx of illegal drugs into this country. *Id.* To this end, Congress enacted, and has more recently amended, federal statutes designed to clarify and to liberalize the restrictions of the Posse Comitatus Act. *See* 10 U.S.C. §§ 371–78 (1988); *Moon v. State*, 785 P.2d at 46.

Regulations promulgated in accordance with this legislation permit joint military-civilian drug enforcement efforts when those efforts are undertaken "for the primary purpose of furthering a military or foreign affairs function of the United States, regardless of incidental benefits to civilian authorities." Former 32 C.F.R. § 213.10(a)(2)(i).[3] More particularly, the Department of Defense has issued a policy memorandum that allows military involvement in investigations of persons not subject to the Uniform Code of Military Justice if the following guidelines are met:

(1) If there are reasonable grounds to believe that such person has committed a drug offense in conjunction with a member of the Armed Forces and the investigative actions are undertaken to obtain evidence concerning all illegal drug transactions between such person and any member of the Armed Forces.

(2) If there are reasonable grounds to believe that such person is the immediate source of the introduction of illegal drugs onto the military installation and the investigative actions are undertaken to obtain evidence concerning all persons engaged in drug trafficking on the installation.

Department of Defense Criminal Investigations Policy Memorandum No. 5 (hereinafter DoD Memo 5), ¶ D.3.b.; *see also Moon v. State*, 785 P.2d at 47–48.

In civilian prosecutions stemming from joint military-civilian investigations into off-base drug sales, courts have interpreted these regulations to require the government to demonstrate a military purpose—that is a nexus between the targeted off-base sales and military personnel; this purpose must be shown to have been the primary purpose of the military's participation. In the absence of a nexus between the targeted off-base drug sales and military personnel, courts have condemned joint investigations as violative of the Posse Comitatus Act. *See, e.g., People v. Tyler*, 854 P.2d 1366 (Colo.App. 1993), *rev'd on other grounds*, 874 P.2d 1037, 1040 (Colo.1994); *State v. Pattioay*, 78 Hawai'i 455, 896 P.2d 911, 917 (1995). By contrast, when the nexus has been shown to exist, no violation of the Act has been found. *See, e.g., McPherson v. State*, 800 P.2d 928 (Alaska App.1990), *rev'd in part on other grounds*, 855 P.2d 420 (Alaska 1993); *Moon v. State*, 785 P.2d at 48; *Badoino v. State*, 785 P.2d 39, 42–43 (Alaska App.1990).

▮ In the present case, the record establishes a clear military purpose in pursuing the challenged investigation: a soldier, T.B., had tested positive for illicit drugs while on duty, and formal military charges had been filed against him; military investigators then focused their attention on T.B.'s sources of supply, who, according to T.B., sold primarily to military personnel. This is precisely the type of investigation covered by DoD memo 5, ¶ D.3.b.2., which authorizes military participation in civilian drug enforcement efforts when reasonable grounds exist to believe that the person targeted by the investigation

---

**3.** The 1981 federal legislation required the Department of Defense to promulgate regulations governing military cooperation with civilian law enforcement officials. *See* 10 U.S.C. § 376. Although these regulations, which were initially codified at 32 C.F.R. § 213, have since been removed from the Code of Federal Regulations, they remain in effect as Department of Defense Directive 5525.5. 58 Fed.Reg. 25776 (April 28, 1993).

is "the immediate source of the introduction of illegal drugs onto the military installation and the investigative actions are undertaken to obtain evidence concerning all persons engaged in drug trafficking on the installation."

The Foxes appear to acknowledge that investigation of T.B.'s immediate sources of supply might be a legitimate military purpose justifying military participation. They point out, however, that APD expressly requested CID to participate in the investigation—purportedly to provide undercover buyers who could convincingly appear to be military personnel. The Foxes reason that, because CID participated in the case at the behest of APD, CID's primary purpose must have been to assist the civilian authorities, and not to track down T.B.'s sources of supply.

But the trial court reached a contrary conclusion, expressly finding that "there was an independent military purpose which justified [CID's] participation[.]" This factual finding is subject to reversal only if clearly erroneous. *See State v. Bianchi,* 761 P.2d 127, 129 (Alaska App.1988).

The record fully supports the trial court's finding. Although CID did agree to participate in the investigation upon APD's request, the record makes it clear that APD's request for military assistance was, in turn, triggered by CID's initial suggestion that APD investigate T.B.'s source of supply. After APD asked for assistance, CID requested and obtained formal Department of Defense authorization to participate in the investigation.

The record as a whole thus supports a reasonable inference that CID was motivated by a legitimate military interest, both in initially contacting APD to suggest an investigation of T.B.'s sources and in subsequently agreeing to provide assistance when APD conditioned its willingness to investigate on the military's willingness to assist. The trial court was not clearly erroneous in finding that CID's participation was primarily motivated by a legitimate military purpose.

██ The Foxes separately argue that even if the military had a genuine interest in investigating T.B.'s sources of supply at the Peterkin Street apartment—where Bradley and Brees had previously sold T.B. drugs—that interest could not have extended to the investigation of drug-related activity by persons other than Bradley and Brees operating at locations other than the Peterkin Street apartment. This argument touches on a valid concern, for CID certainly had no legitimate military interest in participating in a general investigation of off-base drug-related activity. To the contrary, the scope of the military's interest—and of CID's permission to participate in a civilian investigation—was defined by the formal authorization issued pursuant to DoD memo 5.

However, CID had asked for authorization to investigate not only Bradley and Brees, but also "their associates." It is undisputed that this request was granted.[4] CID thus had limited authority to extend its investigative efforts beyond Bradley and Brees—and beyond the Peterkin Street apartment—provided that it acted with "reasonable grounds to believe" that its new target was directly associated with Bradley and Brees and would therefore qualify as an "immediate source of the introduction of illegal drugs onto the military installation[.]" DoD memo 5, ¶ D.3.b.2.

At the evidentiary hearing on the Foxes' suppression motion, CID investigator Eric Weeks testified that, upon arriving with T.B. at the Peterkin Street apartment and learning that Bradley was out of town for several days, he and T.B. were told by a companion of Brees that drugs would be available to them at the North Price Street apartment. That apartment was described "as being a location where Bradley normally hung out

---

4. Although CID specifically requested authority to target Bradley, Brees, and "their associates," the memorandum of approval from CID headquarters is itself ambiguous concerning the scope of the approved investigation, since it expressly mentions only Bradley and Brees, and does not refer to "their associates." At the evidentiary hearing below, however, Kohler testified "with-out doubt" that he acted within the scope of his DoD memo 5 approval in authorizing Weeks and T.B. to go to the Foxes' apartment. This testimony was not challenged. On appeal, the Foxes do not argue that the DoD memo 5 authorization approved only the investigation of Bradley and Brees, thereby in effect disapproving CID's request to target their associates.

where he dealt drugs from. One of his locations." Based on his past experiences, T.B. knew exactly where the apartment was located. And T.B. and Weeks gained admission to that apartment only upon T.B.'s express assurance to Odell Fox that he (T.B.) had been there before.

After considering this evidence, the trial court found that CID's efforts to buy drugs from T.B.'s source at the Peterkin Street apartment "led in the natural and ordinary course of the investigation to the defendants." The record supports this finding and establishes that, in proceeding to the North Price Street apartment and making contact with the Foxes, Weeks and T.B. had reasonable grounds to believe that the Foxes were associated with Bradley in the sale of illicit drugs to military personnel. The trial court did not err in declining to find a Posse Comitatus Act violation under these circumstances.

■ The Foxes next challenge the validity of their indictment, arguing that the state presented the grand jury with insufficient evidence to establish their identity; they further argue that the state introduced inadmissible evidence of prior misconduct. We first consider the sufficiency of the grand jury testimony on the issue of identity.

When CID investigator Eric Weeks bought cocaine at the North Price Street apartment, he was evidently uncertain of the true identities of his sellers. By the time the grand jury met, however, Weeks had determined that his sellers were Larry and Odell Fox. At the grand jury hearing, Weeks simply testified that the persons who sold him cocaine were Larry and Odell Fox; Weeks did not explain the basis for his identification of the Foxes. The Foxes argue, as they did below, that this conclusory testimony was insufficient to establish their identify for purposes of indictment.

■ "The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant." Alaska Criminal Rule 6(q). This court must review the evidence presented to the grand jury to determine whether it "presented a sufficiently detailed account of criminal activity and the defendant's participation in this activity" to meet this standard. *Taggard v. State,* 500 P.2d 238, 242 (Alaska 1972). In making this determination, we must view the evidence in the light most favorable to the state. *Panther v. State,* 780 P.2d 386, 389 (Alaska App. 1989). However, we may not consider evidence that was improperly presented to the grand jury. *Marion v. State,* 806 P.2d 857, 859 (Alaska App.1991).

Here, in testifying before the grand jury, Weeks unequivocally identified the persons who sold him cocaine as Larry and Odell Fox. Weeks' testimony ostensibly reflected his personal knowledge at the time of the grand jury hearing. Unless Weeks' testimony was based on hearsay or derived from some other impermissible source—and the Foxes made no such showing below—the testimony was properly before the grand jury, which was free to accept it at face value or to reject it in its entirety. While the basis for and reliability of Weeks' identification testimony would certainly be proper subjects for cross-examination at trial, the prosecution had no obligation to delve into these issues before the grand jury. *Cf. Frink v. State,* 597 P.2d 154, 166 (Alaska 1979); *Tookak v. State,* 648 P.2d 1018, 1021 (Alaska App.1982) (although the prosecution has a duty to present evidence to the grand jury that is in itself exculpatory, it has no obligation to develop potentially favorable leads for the defendant).[5]

■ We conclude that the evidence before the grand jury was sufficient to establish Larry Fox's and Odell Fox's identities as the persons who sold cocaine to Weeks. We turn

---

5. Fox incorrectly argues that this case is analogous to *Marion v. State,* 806 P.2d 857 (Alaska App.1991), in which we found that evidence of the defendant's proximity to illegal contraband was insufficient to support an indictment; we concluded that mere proximity was insufficient to give rise to a reasonable inference of knowing possession. Here, by contrast, direct and unequivocal evidence was presented to the jury that Larry and Odell Fox were the persons who sold Weeks cocaine; the Foxes simply maintain, without supporting authority, that the conclusory nature of the evidence made it unworthy of acceptance by the grand jury.

next to the Foxes' claim that the state presented inadmissible evidence of prior misconduct to the grand jury.

In testifying before the grand jury about the investigation that led to the charges against Larry and Odell Fox, APD Sergeant Miller described the investigation as having focused on "civilians selling drugs to military personnel." CID investigator Weeks later testified that his role in the investigation had been to "get introduced to known drug dealers." Weeks further testified that he had asked the Foxes to sell him drugs " 'cause they were known to be known drug traffickers." The Foxes argue that these references amounted to evidence of other misconduct that was inadmissible under Alaska Rule of Evidence 404(b); the Foxes further argue that the inadmissible evidence was sufficiently prejudicial to warrant dismissal of their indictment.

■ However, the presentation of inadmissible evidence to a grand jury will warrant dismissal of an indictment only if the remaining, properly admitted evidence would be insufficient or if "the probative force of that admissible evidence was so weak and the unfair prejudice engendered by the improper evidence was so strong that it appears likely that the improper evidence was the decisive factor in the grand jury's decision to indict." *Stern v. State*, 827 P.2d 442, 445–46 (Alaska App.1992) (citations omitted). Here, the state presented the grand jury with strong admissible evidence of guilt. Assuming the disputed references to other misconduct were improper under A.R.E. 404(b), their potential for prejudice was relatively slight in the context of a grand jury hearing. We find no reasonable possibility that this evidence "was the decisive factor in the grand jury's decision to indict." *Stern v. State*, 827 P.2d at 446. Accordingly, we conclude that the trial court did not err in denying the Foxes' motion to dismiss their indictment.

■ The Foxes lastly dispute the trial court's decision admitting as exhibits at trial the packets of cocaine they allegedly sold Weeks. The Foxes argue that Weeks did not adequately identify the packets as those he purchased from them, because, in identifying the packets, Weeks relied only on their general appearance, rather than on any distinct labels or markings. The Foxes further argue that the state offered no evidence to establish the packets' chain of custody after they were tested by the state crime lab, and before their introduction in the courtroom.

■ The admission of real evidence is governed by Alaska Rule of Evidence 901(a), which requires the prosecution to "demonstrate as a matter of reasonable certainty that the evidence ... was at the time it was observed properly identified and free of ... possible taints[.]" The reasonable certainty requirement does not obligate the state to conclusively rule out the possibility of tampering or to produce as a chain-of-custody-witnesses all persons who had contact with the evidence. *Houston–Hult v. State*, 843 P.2d 1262, 1266 (Alaska App.1992). For purposes of a drug prosecution such as the present case, the state's duty to prove proper identification and freedom from taint "at the time [the evidence] was observed," A.R.E. 901(a), must focus on the integrity of the evidence from the time of purchase to the time of testing; potential post-testing alteration would seem wholly immaterial. *See, e.g., People v. Griffith*, 171 A.D.2d 678, 567 N.Y.S.2d 476, 479 (1991).

In the present case, Weeks testified without objection that he recognized the disputed drug packets as the ones he had purchased from Larry and Odell Fox. Weeks said that he turned the packets over to two officers—Miller and Kohler—who had maintained surveillance over his undercover purchases. Miller and Kohler, in turn, confirmed that they received the packets directly from Weeks, and they testified that they labeled, initialed, and sealed them; they ultimately transferred the packets to the crime lab for testing. Based on information they had affixed to the disputed packets, Miller and Kohler identified them as the ones they received from Weeks and turned over to crime lab. Finally, Kathryn Echols, a criminalist from the state crime lab, testified that she received the packets, tested them, and determined that they contained cocaine. Echols then resealed them with distinctive crime lab tape, on which she entered her

initials and an identifying number. At trial, relying on these features, Echols identified the disputed packets as those she had received and tested.

Our review of the record convinces us that the foregoing evidence fully complied with the foundational requirements of A.R.E. 901(a). *Cf. Brown v. State,* 190 Ga.App. 324, 378 S.E.2d 908, 910–11 (1989); *State v. Vance,* 61 Haw. 291, 602 P.2d 933, 942 (1979). The trial court did not abuse its discretion in admitting the exhibits. *Hawley v. State,* 614 P.2d 1349, 1361 (Alaska 1980).

The convictions are AFFIRMED.