Lamar PATTERSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–6617.

Court of Appeals of Alaska.

Oct. 2, 1998.

Maria Bahr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Marcelle K. McDannel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and
MANNHEIMER and STEWART, JJ.

## OPINION

MANNHEIMER, Judge.

Lamar Patterson was convicted of fourth-degree misconduct involving a controlled substance—possession of cocaine.[1] On appeal, Patterson contends that the State failed to establish a proper chain of custody for the cocaine admitted into evidence against him at his trial. In other words, Patterson contends that the State failed to establish that the cocaine introduced into evidence at Patterson's trial was in fact the same substance that was seized from him at the time of his arrest. As explained below, we conclude that the State did establish the necessary chain of custody, and we therefore affirm Patterson's conviction.

(In the recitation of facts that follows, we view the evidence in the light most favorable to upholding the superior court's ruling.[2])

On August 10, 1996, Anchorage police officers executed a search warrant at Patterson's apartment. The warrant authorized a search of both the premises and Patterson's

---

1. AS 11.71.040(a)(3)(A).

2. *See Long v. State,* 772 P.2d 1099, 1101 (Alaska App.1989).

person. Patterson arrived at the apartment while the search was occurring.

Officer Kenneth Welch asked Patterson whether he had any drugs on him. Patterson responded, "I have a little bit on me." Patterson then reached into his waistband and pulled out a small black container with "Marlboro" printed across it. The container held two small yellowish, rock-like substances. Based on his experience with illicit drugs, Welch believed that the two yellowish rocks were crack cocaine.

Welch seized the two rocks and placed them into a special evidence envelope. Welch then sealed both ends of the envelope with special evidence tape—a tamper-proof tape that can not be removed without destroying it. Having taped the evidence envelope shut with this tape, Welch wrote his initials and the date of the seizure across the tape at both ends of the envelope. Upon leaving Patterson's apartment, Welch took the evidence envelope to the Anchorage Police Department's evidence storage facility.

The police evidence storage facility has an anteroom where officers can deposit evidence into storage bins. Welch placed the evidence envelope into a storage bin and turned the lock. By doing this, he shut himself off from further access to the evidence envelope because, once a bin lock has been turned, the bin can not be opened again from the anteroom. Locked bins can be opened only from the inner area of the evidence storage facility—the working area of the police department's property and evidence custodians.

Welch did not have access to this inner area of the storage facility. In fact, the entire storage facility (including the anteroom) is locked, protected by an alarm system, and accessible only by holders of a special access card. Under police department procedures, had Welch wanted to retrieve the evidence, he would have had to request access to the evidence, and he would have had to furnish a valid reason for retrieving the evidence.

In preparing Patterson's case for prosecution, Welch asked the Department of Public Safety's crime laboratory to test the substances he had seized from Patterson. According to the testimony of Everett Clary, a chemist at the state crime laboratory, the entire laboratory facility is secure. Only regular laboratory personnel are allowed free access to the facility. Any visitors to the lab, including police officers, are accompanied at all times by a laboratory employee for the duration of their visit.

All evidence submitted to the crime lab for testing by the Anchorage Police Department is hand-carried to the lab. The Anchorage police have adopted the policy of placing each evidence envelope in a heat-sealed pouch. Each evidence container is supposed to bear an identifying number; crime lab personnel check this number. Crime lab personnel also check to see that the evidence envelope is sealed and the tamper-proof tape is still intact; if not, the laboratory will not accept the evidence. Then both the laboratory custodian (who is receiving the evidence) and the police custodian (who is delivering the evidence) record their signatures to acknowledge the transfer of the evidence.

Within the state crime lab, every piece of evidence is given its own identification number. A crime lab evidence custodian takes custody of all evidence, and all evidence is kept in a locked area protected by an alarm system. When one of the crime lab analysts is ready to test the evidence, he or she must ask the evidence custodian to release it. The custodian then signs the evidence out to the analyst.

To perform the analysis, the crime lab analyst first breaks the seal on the outer plastic pouch. The analyst then removes the evidence envelope and cuts into it—not by tearing the special tape or by opening one of the sealed seams, but rather by cutting through the middle of the envelope. This is deliberate: the purpose of this procedure is to ensure that the analyst's opening and resealing of the evidence envelope will be obvious. The analyst performs the requested tests, and then the analyst reseals the envelope and the plastic pouch.

Each analyst's table has an attachment that can be pulled down and locked, blocking access to all of the drawers. If an analyst is called away while in the middle of testing

evidence, the analyst pulls down this attachment, thus securing the evidence.

At Patterson's trial, Welch was handed an evidence envelope that ostensibly contained the evidence seized from Patterson. Welch identified this envelope as the same one he had used to secure the black container and the two rocks inside it: the envelope bore Welch's initials, a notation of the date the evidence was seized, and a unique, pre-printed number—a number that Welch had transcribed onto his property and evidence report at the scene. Welch further observed that both strips of tamper-proof tape were still intact, and these strips still bore the notations he had made on them.

Examining the envelope at trial, Welch noted that the envelope was sealed in an outer plastic pouch. Welch also noted that the envelope appeared to have been opened in one place since the time he had sealed it. Other than this single intrusion into the envelope, the condition of the envelope was just the same as it was when Welch sealed it. Welch testified that the appearance of the evidence envelope—the way in which it had been opened and resealed—was consistent with the way other evidence envelopes looked after they had been sent to the crime lab for testing.

Based upon this testimony, the State sought admission of the rock-like substances. The defense objected that the State had not identified the officer who transported the evidence to the crime lab, nor had the State identified the laboratory technician who took receipt of the evidence. Despite these objections, the trial judge ruled that the State had established a sufficient foundation to admit the evidence against Patterson.

Following this ruling, Everett Clary opened the evidence bag. Inside the bag were the two rocks. Also inside the bag was a set of initials; Clary identified those initials as his own. Clary then testified that he had tested the two rocks inside the bag, and that the rocks were cocaine.

On appeal, Patterson renews his objection that the State failed to establish that the two rocks of cocaine introduced at trial were in fact the same substances seized from Patterson at the time of his arrest. This question is governed by Alaska Evidence Rule 901(a).

Evidence Rule 901(a) states that if the government offers physical evidence (or testimony describing physical evidence) in a criminal trial, and if that physical evidence "is of such a nature as not to be readily identifiable", or if the physical evidence is "susceptible to adulteration, contamination, modification, tampering, or other changes in form attributable to accident, carelessness, error[,] or fraud", then the government must, as foundational matter, "demonstrate [to a] reasonable certainty that the evidence is ... properly identified and free of the possible taints" identified in the rule.

■■■ For purposes of Patterson's case— a prosecution for possession of drugs—Evidence Rule 901(a) means that the government must prove, to a reasonable certainty, (1) that the substance identified by laboratory testing as a controlled substance is in fact the same substance that was earlier in the defendant's possession, and (2) that the substance was not altered before it was tested.[3] However, the rule that the government must establish the authenticity of the evidence to a "reasonable certainty" does not mean that the State must conclusively rule out all possibility of tampering, nor does it mean that the State must produce any and all persons who had contact with the evidence.[4] For example, in *Houston–Hult v. State* this court rejected a challenge to the State's chain of custody even though the State did not present the testimony of the employee who carried the evidence from the police department to the crime lab.[5]

■■■ Patterson points out that the State presented no evidence to identify the police

---

**3.** *See Fox v. State*, 908 P.2d 1053, 1060 (Alaska App.1995).

**4.** *Fox*, 908 P.2d at 1060; *Wright v. State*, 501 P.2d 1360, 1372 (Alaska 1972); *Houston–Hult v. State*, 843 P.2d 1262, 1266 (Alaska App.1992).

**5.** 843 P.2d at 1264.

department employee who carried the evidence envelope to the crime lab. Patterson also notes that the State failed to identify the police department employee who placed Welch's evidence envelope in the heat-sealed outer pouch. Such evidence was not necessary. The State presented testimony describing the procedures adopted by both the police department and the crime lab to ensure the integrity of physical evidence, and the State also presented testimony that, viewed in the light most favorable to the State, demonstrated to a reasonable certainty that these procedures were followed. We thus conclude that the trial judge did not abuse his discretion when he overruled Patterson's objections and admitted the physical evidence.[6]

Patterson raises a second contention on appeal: that he should have been granted a judgement of acquittal. Patterson argues that the State failed to present convincing evidence that the cocaine belonged to him.

Our conclusion that the cocaine was admissible disposes of this argument. We have found that, viewed in the light most favorable to the State, the evidence demonstrated to a reasonable certainty that the cocaine introduced at trial was, in fact, seized from Patterson at the time of his arrest. Of course, the jury was not bound to believe the State's evidence. But if the State's evidence was believed, that evidence was sufficient to convince reasonable people that the State had proved its case beyond a reasonable doubt.[7] Thus, the trial judge correctly denied Patterson's motion for judgement of acquittal.

The judgement of the superior court is AFFIRMED.

---

**6.** *See Eben v. State*, 599 P.2d 700, 710 (Alaska 1979) (rulings under Evidence Rule 901 are reviewed for abuse of discretion).

**7.** *See Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981); *Silvernail v. State*, 777 P.2d 1169, 1172 (Alaska App.1989).