# Court of Appeals.

October 6, 1903.

## THE PEOPLE v. CARMINE GAIMARI.

(176 N. Y. 84.)

1. MURDER—SUFFICIENCY OF EVIDENCE.

    The evidence upon the trial of an indictment for murder, where defendant claimed that deceased was killed while he was endeavoring to take a revolver away from her, and the People claimed that he killed her deliberately, reviewed and held sufficient to sustain a verdict of murder in the first degree.

2. SAME—COMPETENCY OF THREATS MADE BY DEFENDANT.

    Threats made by defendant are competent to show the state of his mind and are of special importance when accused claims that the homicide was excusable or justifiable, but they should be considered with caution.

3. SAME—EVIDENCE OF SPECIFIC ACTS OF VIOLENCE BY DECEASED TOWARDS DEFENDANT'S WIFE.

    When accused claims he acted in self-defense, it is competent to show the general reputation of deceased for violence, but evidence of specific acts toward a third person, especially when it does not appear that the defendant had heard of it, is inadmissible.

APPEAL from a judgment of the Court of General Sessions of the Peace, in the county of New York, rendered February 27, 1903, upon a verdict convicting defendant of the crime of murder in the first degree; also from two orders of said court denying motions for a new trial and in arrest of judgment, respectively.

The indictment charged that on the 6th of October, 1902, at the borough of Manhattan, county of New York, the defendant, feloniously and with malice aforethought, took the life of Josephine Santa Petro by shooting her with a revolver. The facts, so far as material, are stated in the opinion.

Charles E. Le Barbier, for appellant.

William Travers Jerome, District Attorney (Robert C. Taylor and Howard S. Gans, of counsel), for respondent.

VANN, J.: At the time of the homicide the defendant lived with his wife in a double tenement house, known as No. 56 Roosevelt street, in the city of New York, and Josephine Santa Petro, the deceased, lived with her husband in the same building. The defendant worked in Jersey City, and the deceased was janitress of the building in which both resided. He was thirty-one years old, weighed 130 or 135 pounds, and was not quite as tall as the deceased, who was about forty years of age, five feet and six inches in height, weighed from 175 to 180 pounds, and was a strong, robust, muscular woman. They were acquaintances, more or less intimate, and there was some evidence of jealousy of the deceased on the part of the defendant's wife and of threats made by the former that she would kill the defendant and his wife, and that these threats had been communicated to him.

Maggie Santa Petro, a little daughter of the deceased, twelve years of age, testified that a few days before the homicide the defendant came up to the rooms occupied by her father and his family and, knocking at the door, said he was the landlord, Mr. Golden, but the door was not opened, whereupon he broke in the window, " pulled out a revolver and he pointed it in; my mother ran in the front room door; he said, ' I was going to leave you dead in Roosevelt street.' " Two days before the homicide, a precept issued by a local court, requiring the defendant forthwith to remove from his rooms at No. 56 Roosevelt street, or show cause before the court on the 7th of October, 1902, at 10 a. m., why possession of the premises should not be delivered to Barnard Golden, the landlord, was served upon the defendant and was found upon his person immediately after the homicide.

The homicide took place on the 6th of October, 1902, between nine and ten in the morning, at No. 56 Roosevelt street. The witnesses who saw the occurrence, in whole or in part, differ somewhat in their versions, so that a review of the case upon the merits, which is substantially the only duty presented by the record, requires an analysis of the evidence.

William Gibson, a seafaring man, was in front of No. 56 Roosevelt street, on the opposite sidewalk, between half-past 9 and 10 o'clock on the morning of Monday, October 6, 1902. He saw three women standing in front of No. 56, when a man came out of the doorway, whom he identified as the defendant. The defendant "made a reach for a woman that was standing in the crowd, and as he did so he drew a revolver out of his hip pocket and fired two shots at her; she was dodging around the other women and started to run into the shoe store right next door to No. 56, and as she was going through the door into the place he fired three more. I never heard of the people before. I did not know that they were on earth. After the second three shots were fired at the woman as she went into the door of the cobbler's shop, I went across the street to the sidewalk where she was shot. I seen her lying in there and I started back—lying in the shoemaker's shop, right by the casing at the windows, the cobbler's bench there. I seen blood on the side of her dress."

Kate Looney, who lived at No. 56 Roosevelt street, was talking to Mrs. Petro as she was cleaning the bells by the front door, when the defendant came down stairs and said to the deceased, "You did this," and she said, "I didn't do it, the landlord did it." Thereupon the defendant caught her by the throat and commenced to shove her. The witness thought he was fooling until she saw him pull a revolver out of his pocket and fire three shots, when she ran into the shoemaker's shop, followed by the deceased, who in turn was followed by the defendant. When the defendant went in he fired another shot,

and the witness observed nothing more except that she saw him throw away the revolver. " He was in the store when he chucked it away. He chucked it in the back of the store." The night before, this witness heard the defendant say to the deceased, as he passed by her at the front door, " This is your last night of living." She further testified that when the defendant " fired those shots at the housekeeper he was right up at her side; he had his hand on her when he fired them at her in the store." When sworn before the coroner she did not say that she saw the defendant throw away the revolver.

Angelina Granero lived at No. 56 Roosevelt street, and going down stairs to pay her rent to Mrs. Petro saw her cleaning the knobs of the bells by the front door. While she was engaged in paying her rent the defendant came down stairs and said to Mrs. Petro, " Give us the money," she replied, " No, I wasn't going to give you no money; if I've got to give you any money call me to the court and don't talk to me; don't speak to me; talk to my husband; I don't want you to be talking to me." He asked her for the money again and she said: " Don't be doing me anything; if you do me anything I will call a policeman and make you arrested." In the language of the witness: " From these words they started to be fighting," and, alarmed, she turned to go when Mrs. Petro caught hold of her dress. She next heard three shots from behind her, the hold on her dress was relaxed and she ran away, but looking back saw the defendant shoot again. By fighting the witness may have meant quarreling, for when asked if the parties were striking at each other she answered: " No, sir; fighting, talking."

Louis Cairia testified that he was a shoemaker and was at work in his shop in the front part of No. 56 Roosevelt street at about 8 or 9 o'clock on the morning of the homicide. He heard a shot and raising his head saw the defendant pursuing the deceased, about three feet from her, and shooting at her " in front and in the back, anywhere she turned." He heard

three shots fired outside when he ran out of his shop and the deceased ran in followed by the defendant with a pistol in his hand. After that the witness heard one or two shots inside. The defendant was close to Mrs. Petro as the witness looked up and saw the second and third shots. At this time he saw the defendant shoot at her in front and when she turned he saw him shoot at her back.

Daniel A. Walsh, a collector, was walking down Roosevelt street on the morning in question shortly after half-past nine o'clock. When about opposite No. 56 he heard the report of a revolver, and turning saw a woman running from the hall-way followed by a man, whom he identified as the defendant. She was running from him and he had his left hand on her right shoulder. He next heard two shots in quick succession when she turned and went into the cobbler's shop followed by the defendant, and after that he heard two more shots, making five in all. He went into the shop and saw the woman with blood coming from her back and a wound in her abdomen. Her apron was burned with powder. He saw a man put his hand on defendant and hold him until he was turned over to the police. A few minutes later the witness picked up a revolver in the air shaft at the back part of the store. Each of the five chambers contained an empty shell, and the revolver was hot when he picked it up. It was identified by several witnesses as the one with which the shooting was done.

Three of these witnesses and two others testified that when the defendant was arrested, right after the shooting, he was taken before Mrs. Petro, who was still living. She was asked if he was the man who shot her. She could not speak but nodded her head. In broken English the defendant denied that he did the shooting.

The defendant was seized as he was " trying to get out " of the shoe shop and held until the arresting officer came and took him in custody. A watch, fifteen or sixteen dollars in

money and the precept to dispossess, returnable the next day, were found upon his person. The officer asked him why he did it and he said he did not do it. After the revolver was found he was asked if it was his and he said it was not.

The interne in charge of the ambulance found Mrs. Petro, at about 10 o'clock, lying on the floor of the cobbler's shop, still conscious but suffering from shock. Her clothes were saturated with blood and burned in two places, one in the back just behind the right shoulder and the other in front over the right groin. Beneath each burned spot there was a pistol shot wound in the body. She was taken to the hospital and died in about thirty minutes.

The physician who made the autopsy found two pistol shot wounds, one in the back about two inches to the right of the median line, above the right shoulder blade. The bullet which made that wound lodged in the muscles of the back. The other wound was in front on the right side of the body, and the bullet, after penetrating the abdominal cavity, passed through the bladder and was found in the muscles on the left side. It was of the same calibre as the revolver that was found right after the shooting, both being number 32. The wound in the abdomen, with the internal hemmorhage resulting, was, in the opinion of the physician, the cause of death.

The defendant, when sworn in his own behalf, denied the occurrence testified to by the little girl Maggie, in relation to his breaking into the room of the deceased with a revolver in his hand, and said that he never had a revolver in his possession. He also denied that he ever threatened to kill Mrs. Petro. He testified that on the morning in question he went down stairs to see the owner of the building and found the deceased and another woman. He said, " Good morning," and as he was passing by Mrs. Petro she said, " Come here." As he was going toward her " she drew the revolver, and I, with a jump, grabbed hold of her hand; when so doing two

shots fired in the air, and while I was wrenching the revolver from her hand the revolver went off; in that moment I lost my hat, and while I was picking up my hat from the ground she ran away, and I myself tried to get away and entered the shoe store where I saw her—I met her; she grabbed hold of me and I put my arms around her, and seeing that she was fainting I put her in a chair. I never supposed in that moment that she was wounded. Then the policeman came up and I was arrested, without any resistance." He did not intend to shoot her. He had heard that Mrs. Petro had made a threat against his life, and believed he was in danger of his life. He gave her his salary every week, " because from the first day that she got affectionate with me, she didn't want me to give the money to my wife." He did not go to work that day because he wanted to know from his landlord " what for he dispossessed me when I had paid up everything."

He further testified that when Mrs. Petro drew the revolver she pointed it at him, being about three and one-half feet away. He grabbed her right hand and held it up, when two shots went off in the air, and while he was wrenching her hand to get the revolver away " three shots went off." The record then continues as follows: " By the court: Ask him if he wrenched the revolver from her and if he succeeded in getting it away from her. A. Yes, I succeeded. Q. What did he do with the revolver afterward? A. She was holding me around my body and I fired the revolver; I shot the revolver. Q. Now, when did you fire the revolver? A. After the shots went off and she had clasped her hands around my body and did not want to leave the revolver go. . . . I fired it at nobody. I wanted to unload it in order to prevent her from doing harm to me. . . . The revolver dropped on the sidewalk, and since that time I didn't see it any more. . . . I didn't see her enter the shoe store. Q. Well, you went into the cobbler shop yourself, didn't you? A. Yes, for fear she had some other

weapon; because she always had a knife with her. . . .
By the Fifth Juror: Q. I would like to know in what direction
you fired these shots; how you held the revolver when you fired
these two or three shots? A. I could not say that because of the
position in which she held it, clasping around her arms. I
tried to shoot to the ground. I didn't want to shoot at her."

Julia Osnato testified that about 8 o'clock on the morning
of the homicide she told the deceased that the defendant and
his wife were going away. She replied that if they were going
away she would kill them both. The witness did not tell the
defendant this, but told his wife.

The defendant's wife testified that he never carried a re-
volver. At about half-past 9 on the morning of the homicide
" my boy commenced to cry for his father, and I opened the
window and allowed him to see his father, and then I saw the
housekeeper and my husband was talking both together, . . .
near the door of the house. I noticed that they were quarrel-
ing together, and I from the window hollered to my husband,
saying that he had better leave her alone. Then I saw that
the woman drew a revolver and pointed it and that my husband
went against her to stop her." She started to run down stairs
and on the way heard shots ring out. She was agitated and
trembling, and when she reached the sidewalk the police had
arrived. She also said that the deceased had threatened " all
the time " to destroy both her husband and herself, and that
she told him so. She lived on the fifth floor of the building,
and whatever she saw was from a window at that elevation.

Guiseppe Alzerana testified that on the morning of the
homicide he was out selling bread, and when near No. 56
Roosevelt street saw a man and woman quarreling. She took
a revolver from her dress, the man came against her and the
witness ran away, but heard the shooting immediately.

Several witnesses, one a brother-in-law of the defendant,
testified that his reputation for peace and quietude was good.

Vol. XVII—32

Evidence was given by his employer in Jersey City that the defendant worked every day and all day during the latter part of September and the fore part of October, which covered the period when the daughter of the deceased said that he came to their family rooms with a revolver.

In rebuttal, another daughter of the deceased, fifteen years of age, testified that she did not know of her mother having a pistol. The husband of the deceased said he had lived with her nineteen years and never knew her to have a revolver.

These are the salient facts sworn to by the various witnesses. According to the theory of the defendant he made no threats, had no revolver and used no violence until the deceased wantonly attacked him. He claims that she had threatened his life and was the aggressor; that she was superior to him in size and strength; that as he was passing by her on his own business she called him to her, drew a revolver from her bosom and was about to shoot him, when, apprehending that his life was in danger, he wrenched the weapon from her and as he did so it went off, accidentally so far as he was concerned; that after that, with his arms still around her, he fired the revolver so as to unload it; that he did not intend to shoot her, but tried to shoot toward the ground, and that all he did was in lawful self-defense. His theory finds some corroboration in the testimony of other witnesses.

On the other hand, the People claim that the defendant had twice threatened to take the life of Mrs. Petro; that while she was peacefully engaged in attending to her ordinary duties the defendant either accused her of doing something which she denied, or he asked her for money; that both of these statements may have been made, as the evidence does not exclude either; that without provocation or warning he drew a revolver from his pocket and fired at her five times as she was fleeing from him; that after three shots had been fired she ran into the shoe shop and he followed her, although he might then have

run away if he was afraid of his life; that according to his own statement, when trying to escape from danger he tried to pick up his hat; that if in fear of his life he could have sought protection in the police station but 150 feet away, but instead he followed her into the shoe shop and shot at her twice there, where she was soon found in a dying condition with one wound in her back and another in her abdomen.

It is argued that the defendant shot Mrs. Petro, for no one else was seen to shoot her and she could not have shot herself in the back.    The People claim that he shot her with a deliberate and premeditated design to take her life, and that all the circumstances tend to show that he was the aggressor from the outset and executed the threats which he had repeatedly made.

While the defendant claims that the homicide was accidental and hence excusable, or in self-defense and hence justifiable, the People insist that these defenses are inconsistent.    He clearly had the right to rely on inconsistent defenses, but it is significant that only one could rest on truth.    Either defense makes motive important, and, while no motive to murder can be adequate, still it may be obvious.    Service of the precept to dispossess and the statement of the defendant to Mrs. Petro that she caused it, as sworn to by Mrs. Looney, are relied upon by the People to establish a motive; while threats made by the defendant to kill Mrs. Petro and by her to kill him and his wife are relied upon by both parties.

The defendant and his wife testified that he never had a revolver, and several of his witnesses said that Mrs. Petro drew the revolver in question from her bosom.    On the other hand, the husband and the daughter of the deceased say that she never had a revolver.    Another daughter said that a few days before the homicide the defendant had a revolver and threatened to use it upon her mother, while two witnesses for the People testified that they saw the defendant draw the revolver from his pocket and shoot five times at Mrs. Petro.

The defendant swore that he wrenched the revolver from the deceased, dropped it on the sidewalk and that he did not see it afterward. A witness for the People testified that she saw him throw away the revolver, after the shooting, in the back part of the shoe shop, and several witnesses swore to the finding of the revolver in the air shaft at the rear of the shop, and one that it was then hot, with five empty shells in it. The People further claim that the statement of the defendant's wife, that she saw what she testified to while holding her little boy out of the fifth story window so that he could see his father on the sidewalk, is too improbable for belief.

It is unnecessary to review the case, upon the merits, at greater length, for enough has been said to show that the question as to the defendant's guilt, as to the grade of his offense if he was guilty, as to his claim that he acted in self-defense or that the homicide was the result of accident, were for the jury. They could look into the faces of the various witnesses as they gave their versions of the transaction and decide, so far as human judgment can tell, not only who intended to speak the truth, but who in fact spoke the truth. Representing the average judgment of mankind, they could separate the true from the false with a degree of accuracy which, according to the theory of our law founded on the experience of many generations, cannot be attained by reviewing judges. The memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by those who see and hear than by those who simply read the printed narrative.

Clearly the case was for the jury to decide and we cannot say that their verdict was against the weight of evidence or against law or that justice requires a new trial.

The exceptions are few and unimportant. The defendant moved to strike out the testimony of Kate Looney and Maggie Santa Petro in relation to the threats of the defendant to kill

the deceased made a short time before the homicide on the ground that it was immaterial and incompetent, but the motion was denied and an exception was taken.

For time out of mind recent threats have been held competent to show the state of the defendant's mind toward the deceased. (La Beau v. People, 34 N. Y. 222, 229, 232; Archibald's C. P. 283; Wharton's Crim. Ev. [9th ed.], sec. 756.) They are of special importance when the accused claims that the homicide was excusable or justifiable. Although clearly competent they should be considered with caution, for many an idle threat is made, and words spoken under excitement, are liable to be misunderstood.

The defendant was not allowed to show specific acts of violence alleged to have been committed by the deceased upon his wife, no offer having been made to prove that he knew of them. We find no error in this ruling. When the accused claims that he acted in self-defense, it is competent to show the general reputation of the deceased for violence, but evidence of specific acts toward a third person, especially when it does not appear that the defendant had heard of it, is inadmissible. (People v. Druse, 103 N. Y. 655, 656; Thomas v. People, 67 N. Y. 218; Eggler v. People, 56 N. Y. 643; People v. Lamb, 2 Keyes, 360-371.)

As was said by Judge EARL in Thomas v. People (supra): "There is no authority for holding that proof of specific acts of violence upon other persons, no part of the res gestæ and in no way connected with the prisoner, is competent."

We have considered the other exceptions, but find none which merit the expression of reasons for holding that they raise no error.

No exception was taken to the charge. The court charged each of the fourteen requests presented by the learned counsel for the defendant, including the following: "That use of force or violence upon or toward the person of another is not

unlawful when committed by the party about to be injured, if the force or violence used is not more than sufficient to prevent such offense." In the body of his charge the learned trial judge said to the jury: "On the main defense offered in behalf of the defendant—justifiable homicide—I will read you the law and you will see whether it properly applies. In the Penal Code it is enacted that ' to use, or attempt or offer to use, force or violence upon or toward the person of another is not unlawful when committed by a party about to be injured, or by another person in his aid or defense, in preventing or attempting to prevent an offense against his person, if the force or violence is not more than sufficient to prevent such offense.' " The learned trial judge thus inadvertently read from section 223 of the Penal Code, which relates to the use of force or violence to prevent an assault. (Penal Code, sec. 223, par. 3.) He doubtless intended to read section 205, which relates to justifiable homicide and lays down a more stringent rule in relation to the use of violence resulting in homicide, by limiting it to an occasion "when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony, or to do some great personal injury to the slayer, . . . and there is imminent danger of such design being accomplished." Thus the charge was more favorable to the defendant than he was entitled to. The effect of the charge was that if the defendant thought he was about to be injured by Mrs. Petro he had a right to take her life, which was erroneous, but the error injured the People and benefited the defendant.

The learned judge, however, further instructed the jury that they were "to determine from the testimony whether this defendant had good and reasonable grounds to believe that he was in danger of his life, or of grievous bodily injury, and whether what occurred after he had wrested this pistol from the hands of the deceased and had it in his possession, was more than sufficient force to avert the danger that he

apprehended. From the plain wording of the statute you will see that it applies only where a party is about to be injured." This was a nearer approach to the correct rule, and it is obvious that there is nothing in the charge upon the subject of justifiable homicide of which the defendant has a right to complain, for it was not only too lenient toward him, but it was in accordance with the request of his own counsel.

After carefully considering this case and every error alleged, whether raised by an exception or not, we find nothing that should disturb the verdict, and the judgment pronounced against the defendant must be affirmed.

The judgment and orders should be affirmed.

PARKER, Ch. J., GRAY, HAIGHT, CULLEN and WERNER, JJ., concur; MARTIN, J., absent.

Judgment of conviction affirmed.