THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE ROSSEY, Appellant. [635 NYS2d 970] —Appeal by the defendant from a judgment of the Supreme Court, Queens County (Demakos, J.), rendered April 25, 1994, convicting him of murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is reversed, on the law, the indictment is dismissed, and the matter is remitted to the Supreme Court, Queens County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.

The defendant was tried and convicted, along with the codefendant, Michael Ocasio, of intentional murder and criminal possession of a weapon in the second and third degrees in connection with the shooting death of Joe Guerra on a Queens sidewalk *(see, People v Ocasio,* 222 AD2d 706 [decided herewith]). The defendant argues that the evidence adduced was legally insufficient to support the jury's verdict that he acted in concert with Ocasio to cause Guerra's death. We agree.

It is uncontroverted that the defendant neither possessed the murder weapon nor fired the fatal shots. Therefore, in order to hold the defendant criminally responsible for the murder "the People were obligated to prove beyond a reasonable doubt that [he] acted with the mental culpability necessary to commit the crime and, in furtherance thereof, he solicited, requested, commanded, importuned or intentionally aided [Ocasio] in the commission of the crime [Penal Law § 20.00]" *(People v Torres,* 153 AD2d 911; *see also, People v LaBelle,* 18 NY2d 405; *People v Bennett,* 160 AD2d 949, 951). The People failed to meet this burden since they did not demonstrate that the defendant was acting in concert with Ocasio, who actually shot the deceased.

The evidence adduced against the defendant established that he drove Ocasio, the shooter, and another individual to the scene of the crime. The defendant then called Guerra, the victim, over to the car. When Guerra would not come to the car the defendant brought the car closer to him, and then got out and had what might be characterized as an animated or heated conversation with Guerra. At the conclusion of the conversation, the defendant turned his back on Guerra, thereby

facing Ocasio in the car, and "made a gesture like he was tired of everything with his hands", that is, "both arms went up and back down". As the defendant continued to walk toward the car, Ocasio got out of the car, fired five shots at Guerra, got back into the car, and left the scene, with the defendant at the steering wheel of the car. When one of the witnesses approached the fallen victim, Guerra mentioned the defendant's name and then said that Ocasio shot him.

This evidence, at best, establishes that the defendant had a dispute with Guerra, which was not resolved by their conversation, and that the defendant's companion, Ocasio, pulled out a handgun and shot Guerra. Contrary to the reasoning of the dissent, the evidence cannot be construed as proving beyond a reasonable doubt, let alone to a moral certainty, that the defendant shared Ocasio's intent to kill Guerra. Indeed, there is nothing to indicate that Ocasio was aware of or shared in the defendant's dispute with Guerra or that the defendant was aware that Ocasio had a gun, and there is nothing to indicate that the defendant knew of Ocasio's intent to shoot Guerra or otherwise prearranged the crime *(cf., People v Cabey,* 85 NY2d 417). Although it is possible that the defendant was aware that Ocasio intended to kill Guerra if the defendant and Guerra could not resolve their differences, it is equally possible that the defendant simply had an argument with Guerra and that his actions while walking away from Guerra stemmed from frustration as opposed to any pre-arranged signal to Ocasio to shoot Guerra. In other words, the defendant's relatively innocuous actions, following his argument with Guerra, do not support the conclusion that he "knowingly and intentionally solicited the assistance of [Ocasio] in resolving his dispute with the victim by shooting him" *(People v Middleton,* 192 AD2d 740, 741). Accordingly, the evidence does not exclude the "fair inference" that the defendant did not share in Ocasio's intention to kill Guerra *(see, People v LaBelle, supra; People v Akptotanor,* 158 AD2d 694, *affd* 76 NY2d 1000).

Nor does the fact that the defendant arrived and left with Ocasio otherwise establish the defendant's "community of purpose" with Ocasio. The defendant's mere presence at the scene of the crime is insufficient for a finding of criminal liability *(see, People v Sanchez,* 61 NY2d 1022). In addition, although the defendant drove Ocasio to the scene, we note that the shooting occurred on a public street and thus it cannot be said that the defendant was in any way instrumental in luring Guerra into an isolated area so that Ocasio could carry out the murder *(cf., People v Cabey, supra,* at 421). That the defendant

drove Ocasio away from the scene of the crime after the shooting is of limited probative value especially in view of the fact that the vehicle belonged to the defendant's girlfriend and the defendant was the one who had been driving the car. A defendant's criminal intent is not established by his mere failure to disassociate himself from the shooter once he is aware that a fatal shooting has occurred *(see, People v LaBelle, supra; People v Bennett,* 160 AD2d 949, *supra).*

Thus, the evidence, when viewed in the light most favorable to the People, fails to establish beyond a reasonable doubt that the defendant acted in concert with Ocasio to intentionally cause Guerra's death, and the defendant's conviction must be reversed and the indictment dismissed insofar as it is asserted against him.

In view of our conclusion herein we find it unnecessary to reach the defendant's remaining contentions. Bracken, J. P., Santucci and Joy, JJ., concur.

Friedmann, J., dissents and votes to affirm the judgment appealed from, with the following memorandum: The issue on this appeal is whether the evidence adduced at trial was sufficient to support an inference that the defendant, Jose Rossey, who was not the actual shooter, shared the intent of his codefendant, Michael Ocasio, to kill the victim, Joe Guerra. I find that the People established beyond a reasonable doubt that the defendant shared a community of purpose with Ocasio, so that his conviction of murder under an acting in concert theory should be sustained. Accordingly, I respectfully dissent and vote to affirm the judgment of conviction.

The defendant and Ocasio were jointly tried and convicted of the crime of murder in the second degree. It was the People's theory that while Ocasio actually fired the fatal shots, the defendant was guilty as an accomplice to the murder.

It is well settled that in order to hold an accessory criminally liable for acts committed by a principal actor, the People must prove beyond a reasonable doubt that the accessory possessed the mental culpability necessary to commit the crime charged and in furtherance thereof, solicited, requested, commanded, importuned, or intentionally aided the principal (Penal Law § 20.00; *People v Allah,* 71 NY2d 830; *People v LaBelle,* 18 NY2d 405; *People v Santana,* 141 AD2d 778; *People v Garcia,* 132 AD2d 565). Intent can be established from the act itself or from the defendant's conduct and the surrounding circumstances *(see, e.g., People v Cabey,* 85 NY2d 417; *People v Bracey,* 41 NY2d 296; *People v Armistead,* 178 AD2d 607; *People v Turner,* 141 AD2d 878). In my opinion, the evidence presented

by the People at trial established beyond a reasonable doubt—indeed, to a moral certainty *(see, e.g., People v LaBelle, supra)*—that the defendant shared his codefendant's intent to kill Joe Guerra if Guerra did not accede to the defendants' demands.

According to eyewitnesses Piza and Guzman, who testified at trial, between 8:15 and 9:00 P.M. on the evening of August 12, 1992, the defendant drove a red Toyota back and forth on Liberty Avenue near its intersection with 124th Street in Queens, apparently looking for Joe Guerra. The codefendant Mike Ocasio was in the front passenger seat, and an unknown black male was seated in the back. During the car's first three passes, Guerra was standing, drinking beer with Piza, Guzman, and a group of other friends in front of a laundromat. On his fourth trip by, the defendant stopped in front of the laundromat, but by that time Guerra had crossed the street and was now standing with another friend, Louie, in front of a restaurant. The defendant waved his arm, summoning Guerra to approach, but Guerra gestured back that the defendant should come to *him*. The defendant made a U-turn, and double-parked his car in front of Guerra and Louie.

The defendant got out of the car and, pulling Guerra aside—away from the restaurant and closer to a nearby bus shelter—began to talk to him. Simultaneously, the third man emerged from the rear passenger seat and engaged Louie in conversation. Although the witnesses could not overhear the defendant's discussion with Guerra, they agreed that the 5-to-15 minute conversation quickly deteriorated into a heated argument, punctuated by raised voices and animated hand gestures. While Guerra was still talking, the defendant spun on his heel and, walking toward the codefendant Ocasio, who remained seated in the red Toyota, threw his arms into the air and then dropped them, in a gesture which Piza characterized as, "like he was tired of everything".

Immediately, the codefendant "hurr[ied]" out of the Toyota, while simultaneously pulling a gun from his waistband. Walking swiftly up to Guerra, Ocasio fired five shots into Guerra's body from about three feet away. Meantime, the defendant had re-entered the Toyota, where he waited behind the steering wheel until the codefendant finished firing, and until both the codefendant and the third man had gotten back inside the vehicle. The defendant then drove himself and his two companions away from the scene of the shooting at a high speed. To the witnesses who ran to help the prostrate Guerra, the dying man whispered, "Rossey and Mike", and then, "Mike shot me".

Although the record does not reveal the nature of the defendants' underlying dispute with Guerra, it is apparent that the other young men who were "hanging out" on Liberty Avenue knew all about it, and so were particularly attentive when "Rossey and Mike" confronted Guerra. For example, eyewitness Piza testified that while the defendant was conversing with Guerra, "I made it my business to keep an eye on Joe to see what was going on", because Piza was "concerned with what was happening with Rossey and Joe". Similarly, when eyewitness Guzman turned away momentarily, his friend Leo alerted him to look back because "Mikey's coming out [of the car]".

As I read this record, the instant matter fits into the line of cases where appellate courts have affirmed a verdict of guilty because the defendant's actions have evidenced his full knowledge of and participation in his more active codefendant's criminal intentions. That is, even in cases resting entirely on circumstantial evidence, appellate courts have not hesitated to affirm a conviction based upon a jury's rational finding that "community of purpose" had been proved beyond a reasonable doubt. In such cases, the courts have ruled, the inference of guilt must be consistent with and flow naturally and logically from the facts proved (see, e.g., People v Cabey, 85 NY2d 417; People v Whatley, 69 NY2d 784; People v White, 162 AD2d 646). However, the evidence need only exclude every "*fair* inference"—not every *conceivable* inference—except guilt (People v Monaco, 14 NY2d 43, 45 [emphasis supplied]). As the Court observed in People v LaBelle (18 NY2d, supra, at 412), "the prosecution is not required to produce such proof that an 'absolute or metaphysical certainty' of the defendant's guilt is created".

The courts have considered significant in evaluating the evidence in these and similar cases such facts as: that the defendant set out with the active perpetrator, apparently by prearrangement; that he acted in unison with the active perpetrator; that he made his own contribution to the hostilities expressed toward the victim during the course of the crime; and that he fled with the active perpetrator (see, e.g., People v Middleton, 192 AD2d 740; People v Pittman, 189 AD2d 918; People v Armistead, supra; People v Santana, supra; People v McClary, 138 AD2d 413; People v Warner, 119 AD2d 841; People v Dorsey, 112 AD2d 536).

Here, the defendant, the shooter Ocasio, and a third man set out by apparent prearrangement in a car driven by the defendant to seek out Guerra. After the trio had tracked the victim

down, the third man distracted Guerra's companion while the defendant drew Guerra aside—perhaps closer to Ocasio—while he made his demands. When, after a protracted argument, Guerra still refused to cooperate, the defendant turned to Ocasio and gave what the jury and the trial court, who saw and heard the witnesses, clearly construed as a *signal.*

Particularly in a case of this sort, where pivotal evidence was in the nature of facial expressions, inflections and pantomime, great weight should be accorded the determination of the trier of fact, because of "its peculiar advantages of having seen and heard the witnesses" *(People v Prochilo,* 41 NY2d 759, 761; *People v Gaimari,* 176 NY 84). In the absence of a videotape of the testimony of the two eyewitnesses, an appellate court should not, working from a cold transcript, second-guess the jury in its reading of such evidence, particularly where its interpretation is otherwise fully supported by the record *(cf., People v Garafolo,* 44 AD2d 86). In addition, it is incumbent upon this Court to assess the legal sufficiency of the evidence by viewing it in the light most favorable to the People *(see, People v Malizia,* 62 NY2d 755, *cert denied* 469 US 932; *People v Contes,* 60 NY2d 620). When this is done in the case at bar, it is apparent that "the jury's inferences naturally flowed from, and were properly based on, the evidence presented and not on unsupported assumptions" *(People v Pittman, supra,* at 920).

That the defendant and Ocasio shared a community of purpose to kill Guerra is evidenced by the species of transferred intent that the jury clearly perceived here. That is, Ocasio avenged the defendant, who had been displeased by his encounter with the intransigent Guerra. Put somewhat differently, the defendant activated Ocasio's murderous intent by signaling to him with an exasperated shrug of his arms and shoulders: "I've done my best, and now I give up. He won't cooperate. He's all yours." After the shooting, the defendant waited for his accomplices to reassemble in his car, and then drove them all away. There is absolutely nothing in this body of evidence that could give rise to a *"fair* inference" that the defendant, Ocasio, and the third man did *not* share a "community of purpose" to kill Guerra if Guerra were not brought around on some issue (presumably drugs and/or money) by the defendant's arguments.

This case is distinguishable from the line of cases, relied upon by the majority, in which evidence or circumstances suggest that the defendant was unaware that the active perpetrator intended to commit the subject crime. In such cases, the

courts have emphasized that the codefendant, usually driven by some independent motive, acted upon a spontaneously formed decision, to the defendant's evident surprise. Such cases are usually characterized by a significant separation between the defendant and the active perpetrator at some critical juncture, such that the inference is "fair" that the defendant was not privy to, let alone a partner in, the latter's criminal intent.

For example, in *People v LaBelle (supra),* the defendant Richard LaBelle was in the car with his brother Edward when Edward induced a girl to join them "for a ride". Apparently none of the evidence contradicted the defendant's statement that he was "shocked and surprised" when Edward proceeded to rape and then kill the girl; but because he feared for his own safety, the defendant remained silent and helped his brother dispose of the body. In his statement to police, the defendant maintained that he had attempted throughout the evening to intercede with his brother on the girl's behalf; and the court found that the defendant, who had not been an active participant in the rape, had had no motive to desire the girl's death. In the instant case, in contrast, it was the *defendant* who had the motive to desire Guerra's death (i.e., because the defendant had just lost his argument with Guerra). In addition, far from being a timid subordinate, the defendant was apparently "in charge", effectively "ordering" Ocasio to shoot Guerra.

Similarly, in *People v Torres* (153 AD2d 911), the defendant had armed himself with a knife with which he intended to stab the decedent, but, as he was quarreling with the decedent in a laundromat, an unknown man entered and gunned the decedent down. This Court found that there was no evidence that the defendant shared the shooter's " 'intent to [kill] by means of a gun' " (153 AD2d 911, 912, *supra).* In the matter at bar, by contrast, the defendant's hand-signal transmitted to Ocasio the defendant's "intent" that Guerra be killed by means of whatever weapon Ocasio happened to be carrying.

An analogous disjunction characterizes the relationship between the defendant and the shooter in *People v Akptotanor* (158 AD2d 694) (affirmed by the Court of Appeals in the following language: "On the state of the record before us, we cannot say as a matter of law that the Appellate Division erred" [*People v Akptotanor,* 76 NY2d 1000, 1001]). In *Akptotanor,* the shooter had been humiliated by the fact that his wife had left him and was now pregnant by another man. The shooter blamed his wife's contumacy on a woman named Itoje, with

whom the wife was living. The defendant, who was the wife's brother, displayed his solidarity with his brother-in-law by dragging Itoje out of her house and shouting, " 'Come. Come, Jonathan and get her. She's out here. She's out here. Come and get her.' " *(Supra,* at 695.)* Jonathan ran across the street, suddenly pulled a gun from his waistband, and shot Itoje three times, killing her. This Court found that although "there was some community of purpose between the defendant and the shooter" (i.e., to punish Itoje in some fashion), "the purpose established was less in degree than an intention to kill", *supra,* at 695). I do not believe that this Court would have arrived at the same conclusion in *Akptotanor* had the defendant driven Jonathan and a third accomplice to Itoje's house; commissioned the third accomplice to isolate Itoje by distracting her companions; pulled Itoje aside so that she was, perhaps, more easily reached by Jonathan; signaled Jonathan when to pull the trigger; and then waited in the driver's seat of the getaway car for his accomplices to reassemble inside, before taking off with "[w]heels * * * screeching".

Because *all* of the circumstances of this case support the jury's conclusion that the defendant shared a community of purpose with Ocasio, I would affirm the judgment of conviction.