People v Garrow (2019 NY Slip Op 03238)





People v Garrow


2019 NY Slip Op 03238


Decided on April 26, 2019


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on April 26, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CENTRA, J.P., CARNI, LINDLEY, TROUTMAN, AND WINSLOW, JJ.


1380 KA 15-02037

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
ROBERT GARROW, DEFENDANT-APPELLANT. 






FRANK H. HISCOCK LEGAL AID SOCIETY, SYRACUSE (ELIZABETH RIKER OF COUNSEL), FOR DEFENDANT-APPELLANT. 
WILLIAM J. FITZPATRICK, DISTRICT ATTORNEY, SYRACUSE (NICOLE K. INTSCHERT OF COUNSEL), FOR RESPONDENT. 


 Appeal from a judgment of the Onondaga County Court (Joseph E. Fahey, J.), rendered October 8, 2015. The judgment convicted defendant, upon a jury verdict, of predatory sexual assault against a child and rape in the first degree. 
It is hereby ORDERED that the judgment so appealed from is affirmed.
Memorandum: Defendant appeals from a judgment convicting him following a jury trial of rape in the first degree (Penal Law § 130.35 [3]) and predatory sexual assault against a child (§ 130.96). Defendant's conviction stems from his rape of a four-year-old girl. Defendant's first trial ended in a hung jury, and he was convicted after a second jury trial. On appeal from that judgment, we reversed on the basis of an O'Rama violation and granted a new trial (People v Garrow, 126 AD3d 1362 [4th Dept 2015]). Defendant did not challenge the weight of the evidence on that appeal. The third trial then proceeded, and a jury again convicted defendant.
The victim, who was 11 years old at the time of this third trial, testified that she was very familiar with defendant. She testified that defendant did a "bad touch" to her by putting his "front private part" inside her "front private part," and that it hurt. Shortly after the incident, the victim disclosed to her mother that her vagina hurt. When asked why, the victim told her that defendant "did something bad" to her. After having her recollection refreshed, the victim more specifically testified that she told her mother that defendant did it "[w]ith his penis." The victim's mother gave similar testimony regarding the victim's disclosure, and explained that she taught the victim terminology for body parts at a young age because the mother was sexually molested as a child.
The victim testified that her cousin did the "same thing" to her as defendant and that it happened more than once. She testified that this occurred at her aunt's house. After the victim disclosed defendant's abuse to her mother, the mother immediately confronted defendant and asked why the victim was making the allegation against him. Defendant was non-responsive at first, but eventually stated, "I don't know. She said something about [her cousin] earlier." When the mother asked the victim if the cousin had done anything to her, the victim responded in the affirmative. The mother testified that the last time she recalled the victim spending the night at the cousin's house was more than a month prior to the disclosure she made regarding defendant. The cousin admitted that he had sexually abused the victim; he was 11 years old at the time. The victim testified that she was not confused about the incident with defendant or the incident with her cousin.
The mother took the victim to the hospital the same day she made the disclosure regarding defendant. The victim was examined by medical personnel and diagnosed with possible sexual abuse and diaper rash, but the victim was not wearing diapers at the time. She was prescribed a cream that treated yeast infections, of which the victim had a history. The [*2]victim was taken to the police station where she was questioned by a detective, and she testified that she told the detective that defendant had raped her. The detective testified that the victim disclosed that she had been sexually abused by both defendant and her cousin.
The following day, as instructed by the police and medical personnel, the mother brought the victim to a medical facility where a sexual assault examination was performed. Due to the victim's age, the gynecological examination was performed externally only and showed some redness to the external part of the victim's genitals, but no damage to the hymen. Testimony was given that most female rape victims do not exhibit injury to their genital area. A nurse testified that, although she would expect to see some damage in a four year old who had been raped by an adult male with full penetration and no lubrication, there may be no injury if the penetration was slight or there was lubrication. The nurse practitioner who examined the victim did not observe symptoms indicative of a yeast infection. She could neither confirm nor deny that sexual abuse had occurred to the victim.
The underwear that the victim was wearing the day she went to the hospital was secured and examined. In addition, dried secretion swabs were taken from three areas on the victim's thighs and buttocks that showed areas of fluorescence under a black light. A forensic scientist who examined the evidence testified that semen was not detected on any of the vaginal, anal, oral, or dried secretion swabs from the sexual assault examination kit. Using an alternate light source, she saw areas of fluorescence on the underwear, indicating potential bodily fluids in areas where drainage from the vaginal or anal cavity were most likely to be found. She took three very small cuttings of those areas to view under a microscope and identified sperm on those three locations, which were in the front interior crotch area, the middle crotch area, and on the back of the underwear near where there would be a tag. The forensic scientist testified that the presence of sperm indicated the presence of semen at those locations inasmuch as sperm is a component of semen. She further testified that she conducted another "presumptive" test for the presence of semen, the acid phosphatase (AP) test, and those tests on 20 different sections of the underwear were negative. Another forensic scientist conducted DNA testing of the sperm fraction from the middle crotch area of the inside of the underwear and testified that it matched that of defendant.
The forensic scientists admitted that they were aware of the concept of secondary sperm cell transfer from one item of clothing to another in the washing machine. The mother testified that she would launder defendant's clothing and the victim's clothing together. The second forensic scientist testified that, where the AP test was negative for the presence of semen but sperm were present on clothing, transfer of sperm through the washing machine was a possibility. She further testified, however, that she did not believe that was the most probable explanation for the sperm being present in the underwear based on the number of sperm that she observed and the amount of DNA that was extracted.
In his summation, defense counsel argued that the victim had a yeast infection, which caused the victim's statement to her mother that her vagina hurt; that the mother, who had been sexually abused as a child, turned the victim's innocent comment that "[defendant] did it" into an accusation that defendant raped the victim, which the mother repeated in front of the victim numerous times; that the victim had been abused by her cousin, and the mother steered the investigation towards defendant instead of the cousin; that the victim's testimony showed that she easily remembered the abuse by her cousin but was confused about the alleged abuse by defendant; that physical evidence of injury would be expected in this case but the victim did not sustain such injury; and that the presence of sperm on the victim's underwear was explained by secondary transfer through the washing machine. The prosecutor urged the jury to consider the victim's demeanor when she talked about the abuse and argued that she was worthy of belief. The prosecutor further argued that it was not a simple coincidence that defendant's "semen" was found in the crotch of the victim's underwear the same day she made her complaint.
In this appeal, defendant's primary contention is that he was denied a fair trial by prosecutorial misconduct. Defendant failed to object to the alleged instances of misconduct and therefore failed to preserve his contention for our review (see People v Black, 137 AD3d 1679, 1680 [4th Dept 2016], lv denied 27 NY3d 1128 [2016], reconsideration denied 28 NY3d 1026 [2016]). In any event, we conclude that defendant's contention is without merit. First, defendant contends that the prosecutor and witnesses erroneously and repeatedly stated that semen was found in the victim's underwear. The first forensic scientist testified that semen was present in [*3]the underwear by virtue of the presence of sperm, even though the AP tests had been negative. We disagree with defendant that the prosecutor elicited false testimony or misled the jury on this point (see generally People v Mulligan, 118 AD3d 1372, 1374 [4th Dept 2014], lv denied 25 NY3d 1075 [2015]). The defense theory was that the sperm could have transferred to the victim's underwear in the wash, but that was only a theory. The other possibility was that the sperm cells were deposited on the underwear through semen. As the first forensic scientist testified, while the AP test is a specific screening test for semen, the actual observation of sperm on an item of clothing is an even more specific test for the presence of semen. The prosecutor's comment on summation regarding the presence of semen in the underwear was fair comment on the evidence (see People v Jackson, 141 AD3d 1095, 1096 [4th Dept 2016], lv denied 28 NY3d 1146 [2017]).
Second, defendant contends that the testimony of the second forensic scientist that secondary sperm transfer probably did not take place in the washing machine was based on a factor, i.e., the large amount of sperm and DNA on the underwear, that was shown not to be the case in the two prior trials. Any alleged inconsistency between the witness's testimony at this trial and the previous trials should have been developed during cross-examination (see generally People v Hurd, 71 AD2d 925, 925 [2d Dept 1979]). We reject defendant's contention that the prosecutor elicited knowingly false testimony from the witness (see generally People v Colon, 13 NY3d 343, 349 [2009], rearg denied 14 NY3d 750 [2010]).
Third, defendant contends that the prosecutor's opening and closing statements improperly appealed to the emotions of the jury. We conclude, however, that most of the prosecutor's statements were fair response to defense counsel's statements (see Jackson, 141 AD3d at 1096). " Faced with defense counsel's focused attack on [the victim's] credibility, the prosecutor was clearly entitled to respond by arguing that the witness[ ] had, in fact, been credible' " (People v Roman, 85 AD3d 1630, 1632 [4th Dept 2011], lv denied 17 NY3d 821 [2011]). To the extent that any comments exceeded the bounds of proper comment, we conclude that they were not so pervasive or egregious as to deprive defendant of a fair trial (see People v Pendergraph, 150 AD3d 1703, 1703-1704 [4th Dept 2017], lv denied 29 NY3d 1132 [2017]).
Fourth, defendant contends that the People improperly suggested that there had been more than one incident of abuse. The two prosecutors at the third trial, who were not the same ones from the prior trials, were under the mistaken impression that the two rape counts in the indictment were based on two separate incidents, when in fact it was two theories of rape based on only one incident. Defense counsel, who did not represent defendant at the prior trials, agreed with the prosecutors that the charges in the indictment were based on two incidents of rape. During the victim's testimony, the prosecutor asked her about a possible second incident. The victim initially testified that she could not remember, but then testified that it did occur. The victim admitted, however, that she was confused about whether there was a second incident, and testified that she did not think defendant did it a second time. Later during the trial, and after the victim's testimony, County Court reviewed the grand jury minutes and concluded that the charges had stemmed from just one incident. The court therefore struck the victim's testimony regarding the second alleged incident and instructed the jury that there was no evidence of more than one incident of rape. The court also dismissed the second count of rape charged in the indictment to avoid any possible confusion. The court found that the prosecutor's suggestion of a second incident was an honest mistake, and we conclude that the court's instructions were sufficient to alleviate any prejudice resulting from the testimony (see People v Spears, 140 AD3d 1629, 1630 [4th Dept 2016], lv denied 28 NY3d 974 [2016]). In any event, we conclude that defendant was not denied a fair trial by the prosecutor's erroneous elicitation of that testimony inasmuch as the testimony regarding the second incident was equivocal, at best.
Fifth, defendant contends that the prosecutor engaged in misconduct when she refreshed the victim's recollection regarding her disclosure to her mother. The victim testified that she told her mother that defendant "did something bad" to her, but she could not remember specifically what she told her mother that defendant did. The court allowed the prosecutor to refresh the victim's recollection using a transcript from the mother's testimony at the second trial. Her recollection having been refreshed, the victim testified that she told her mother that defendant did it "with his penis." Contrary to defendant's contention, a witness's testimony may be refreshed using any writing, whether or not made by the witness (see People v Betts, 272 App Div 737, 741 [1st Dept 1947], affd 297 NY 1000 [1948]; People v Goldfeld, 60 AD2d 1, 11 [4th Dept 1977], [*4]lv denied 43 NY2d 928 [1978]). There was therefore no misconduct by the prosecutor in refreshing the victim's recollection.
Defendant's next contention is that he was denied effective assistance of counsel based on counsel's failure to object to the above instances of alleged prosecutorial misconduct. Inasmuch as we conclude that the prosecutor either did not engage in misconduct, or that any error did not deny defendant a fair trial, we conclude that defendant was not denied effective assistance of counsel based on counsel's failure to object (see People v Lewis, 140 AD3d 1593, 1595 [4th Dept 2016], lv denied 28 NY3d 1029 [2016]; People v Lyon, 77 AD3d 1338, 1339 [4th Dept 2010], lv denied 15 NY3d 954 [2010]). Defendant's further contention that counsel was ineffective in failing to call an expert witness to testify regarding the washing machine theory is without merit (see People v Loret, 56 AD3d 1283, 1283 [4th Dept 2008], lv denied 11 NY3d 927 [2009]). Defendant failed to establish the absence of any strategic or other legitimate explanation for the failure to call such an expert (see generally People v Caban, 5 NY3d 143, 152 [2005]).
We now turn to defendant's contention on which we part ways with our dissenting colleague, i.e., the weight of the evidence. It is well settled that, in reviewing the weight of the evidence, we must first determine whether, "based on all the credible evidence[,] a different finding would not have been unreasonable" (People v Bleakley, 69 NY2d 490, 495 [1987]; see People v Danielson, 9 NY3d 342, 348 [2007]). We all agree that a different finding here would not have been unreasonable; the jury could have accepted the defense theory as set forth above and rejected the testimony of the victim. Our next step is to "weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions" (Danielson, 9 NY3d at 348; see Bleakley, 69 NY2d at 495). In undertaking such an analysis, "[g]reat deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor" (Bleakley, 69 NY2d at 495).
There was no conflicting testimony here, only conflicting inferences that could be drawn from the evidence. We conclude that, viewing the evidence in light of the elements of the crimes as charged to the jury (see Danielson, 9 NY3d at 349), the verdict is supported by the weight of the evidence. The victim testified that defendant placed his penis inside her vagina and that it hurt when he did so. The victim made a prompt disclosure of the abuse to her mother and then to the police detective, and both of those witnesses testified consistently with the victim regarding the disclosure. After the victim's disclosure, her mother immediately confronted defendant, who was sleeping in a bedroom, and asked him why the victim was saying that he hurt her vagina with his penis. The mother repeated that three times before defendant said, "[h]uh, what?" The mother testified that she was "very agitated because [she] knew that he heard me the first time," and upon shouting it for a fourth time, defendant responded, "I don't know. She said something about [her cousin] earlier." Defendant never denied the accusation, and we agree with the prosecutor's statement in summation that defendant's response does not seem to be that of a man who has been wrongfully accused of sexually assaulting someone he is close with. The victim's sexual assault examination revealed that the victim had redness to the external part of the genital area. Testing of the underwear that the victim was wearing at the time she made the disclosure to her mother showed that sperm later identified as matching defendant's DNA were on three locations of the underwear where drainage from the vaginal or anal cavity was most likely to be found.
The jury's determination to reject the defense theory was in accord with the weight of the evidence. The defense theory was that the victim's vagina hurt because she had a yeast infection, but the evidence was not clear on that issue. A yeast infection did not appear to be the diagnosis of the hospital, which appeared to diagnose the victim with possible sexual abuse and diaper rash, even though she no longer wore diapers. Although medical personnel at the hospital prescribed a cream that treated yeast infections, and the victim's mother testified that the victim had a history of yeast infections, the examining nurse who conducted the sexual assault examination testified that she did not observe symptoms that were indicative of a yeast infection and thus the victim was not tested for that condition. The defense theory was also that the victim made an innocent comment to her mother that "[defendant] did it" after stating that her vagina hurt, and the mother jumped to conclusions that defendant had raped the victim. The victim's actual statement to her mother, however, was not so innocent or innocuous. Even disregarding the victim's statement after having her memory refreshed, she testified that she remembered telling her mother that "[her] vagina hurt and that [defendant] did something bad to [her]."
The defense theory was also that the victim was confused by her cousin's abuse of her and the alleged abuse by defendant. The victim testified, however, that, although her cousin had done the same thing to her, she was not confusing the abuse by her cousin with the incident involving defendant. We note that the victim was only 4 years old at the time of this incident, the cousin was 11 years old, and defendant was 32 years old. We find it unlikely that the victim would confuse the abuse of her by another child with that by a grown man. Defense counsel also argued to the jury that physical evidence of injury would be expected in this case. Indeed, a nurse testified that she would expect to see some injury in a four year old who had been raped by an adult male with full penetration. That nurse, however, further testified that there may be no injury if the penetration was slight or there was lubrication. The jury heard that it was not uncommon for female rape victims not to exhibit injury to their genital area.
Lastly, the defense theory was that the sperm on the victim's underwear was explained by the washing machine theory, i.e., that defendant's sperm had transferred from an item of clothing in the washing machine to the victim's underwear. The jury heard testimony that this was certainly a possibility, but the other possibility was that the sperm had been deposited on the victim's underwear through defendant's semen. The second forensic scientist testified that the defense theory was not the most probable explanation, and the jury apparently agreed.
In sum, in a case such as this where the credibility of a witness is crucial to the determination of the defendant's guilt, we must be cognizant that we did not see or hear the victim testify. "[T]hose who see and hear the witnesses can assess their credibility and reliability in a manner that is far superior to that of reviewing judges who must rely on the printed record" (People v Lane, 7 NY3d 888, 890 [2006]). "The memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by those who see and hear than by those who simply read the printed narrative" (People v Gaimari, 176 NY 84, 94 [1903]). The prosecutor urged the jury during her opening statement to pay careful attention to the victim when she testified: "watch her eyes, watch her demeanor, watch her as she tells you about those memories." In the prosecutor's summation, she again urged the jury to consider the victim's demeanor as she testified. It appears from the jury notes that the jury was focused on the victim's testimony, asking to have it read back to them and also asking to hear a readback from that part of the police detective's testimony where the victim disclosed the abuse to him. We see "no reason to disturb the jury's clear resolution of the issue of credibility in favor of the victim" (People v Beauharnois, 64 AD3d 996, 999 [3d Dept 2009], lv denied 13 NY3d 834 [2009]), and we are "convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt" (People v Delamota, 18 NY3d 107, 117 [2011]).
Finally, we conclude that the sentence is not unduly harsh or severe.
All concur except Lindley, J., who dissents and votes to reverse in accordance with the following memorandum: I respectfully dissent. In my view, the People failed to prove defendant's guilt beyond a reasonable doubt, necessitating reversal of the judgment and dismissal of the indictment. The four-year-old complainant was examined at the hospital within a day of when she alleged that defendant had raped her. Defendant had no criminal record and had never been accused of inappropriate sexual conduct by the victim or anyone else. The examination of the victim revealed a rash in the genital area but no damage to her hymenal tissue and no trauma to her vagina. As one of the nurses who examined the complainant acknowledged at trial, it is not typical for such a young girl who has been raped by a grown man to have no damage to her hymen. Although rape does not require penetration, the People's theory in this case was that defendant ejaculated inside the victim and that the sperm later drained onto her underwear, meaning that there must have been significant penetration.
In an attempt to explain away the lack of physical injury, the People called as an expert witness a pediatric nurse practitioner who has examined approximately 5,000 children for suspected sexual abuse. According to the expert, only 5-10% of the female child victims displayed an injury in the genital area. On cross-examination, however, the expert clarified that the 5-10% figure includes female victims up to age 21, and that most of the 5,000 victims she examined were not "acute" patients, i.e., they were not, unlike the complainant herein, examined immediately after the alleged sexual abuse occurred. Thus, the expert's testimony with respect to the lack of physical injury is close to meaningless in this case.
I note that the expert acknowledged that studies show that between 50 and 90% of female rape victims sustain physical injury to the genital area. The People assert that the complainant had pain and redness in her genital region, and that this therefore corroborates her testimony. But the complainant also had a yeast infection, which could just as plausibly explain the pain and redness, and, again, it is undisputed that there was no damage to the hymenal tissue notwithstanding the People's theory that the four-year-old complainant had been forcibly raped by an adult who ejaculated inside her.
A second problem with the case is that, although defendant's sperm was found on the victim's underwear, the attending nurse performed 20 separate AP tests on the underwear, and all 20 tests were negative for semen. The People's expert testified that the sperm, which is only a small component of semen, was likely the result of "discharge" from the victim's vagina. If there was such discharge, it stands to reason that the non-sperm portions of semen would also be on the underwear, but none were found. The People have no explanation for how defendant's sperm but not semen could be on the underwear.
The only explanation that has been proffered is defendant's theory that the sperm was transferred onto the underwear in the wash from clothes or bedding that contained his semen. The People's experts acknowledged at trial that this is a scientifically valid theory, as the sperm could survive the wash and become embedded in the underwear while the other components of semen would get washed away. Nevertheless, the People's DNA expert testified that she did not believe that the laundry explanation was "the most probable explanation for the sperm being there." Of course, it is not enough for the People to prove that defendant is probably guilty (see People v Carter, 158 AD3d 1105, 1106 [4th Dept 2018]); they must prove his guilt beyond a reasonable doubt. I note that none of the People's witnesses testified that the AP test can result in false negatives.
I am also troubled by the complete absence of any semen or sperm on any of the swabs taken from the victim's legs, buttocks, vaginal area and anal area. If the sperm drained onto the underwear, as the People posit, one would think that it would have drained onto the victim's thighs or near her vagina. But no semen or sperm was found in any of those areas, notwithstanding that the victim had not showered or bathed since the attack.
It is true, as the People point out, that we generally afford great deference to credibility determinations made by the trier of fact, who is in a far superior position to assess the veracity of witnesses (see People v Bleakley, 69 NY2d 490, 495 [1987]), and here the jury evidently believed the victim's testimony that defendant placed his penis in her vagina. The victim was only four years old when this happened, however, and she repeatedly testified that she could not remember much about the incident, other than it happened on the bed and that she was on top of defendant, which seems at odds with how the rape of a young child would usually occur.
I note that the prosecutor, who was under the misapprehension that defendant had been charged with two separate rapes, asked the victim whether "this" happened another time, and the victim answered "yes." As the court later determined, defendant had been charged with only one rape, and the victim had never previously made any allegations about a second incident. The victim's affirmative response to the question about a second incident that never occurred raises concerns about the reliability of her testimony with respect to the first incident, especially considering that it is undisputed that the victim was raped by her older cousin shortly before she claimed she was raped by defendant.
Concerned "about the incidence of wrongful convictions and the prevalence with which they have been discovered in recent years," the Court of Appeals has stressed the importance of the role of the Appellate Division in serving, "in effect, as a second jury," to "affirmatively review the record; independently assess all of the proof; substitute its own credibility determinations for those made by the jury in an appropriate case; determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt" (People v Delamota, 18 NY3d 107, 116-117 [2011] [emphasis added]; see People v Oberlander, 94 AD3d 1459, 1459 [4th Dept 2012]). Here, I am not convinced that defendant's guilt was proven beyond a reasonable doubt. I therefore vote to reverse the judgment and dismiss the indictment.
Entered: April 26, 2019
Mark W. Bennett
Clerk of the Court