■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ROBERT VERNACE, Respondent. [711 NYS2d 492] —Appeal by the People from an order of the Supreme Court, Queens County (Eng, J.), dated July 8, 1999, which granted the defendant's motion to dismiss the indictment on the ground that preindictment delay violated his right to a speedy trial.

Ordered that the order is reversed, on the law, the motion is denied, the indictment is reinstated, and the matter is remitted to the Supreme Court, Queens County, for further proceedings on the indictment.

The defendant contends that the lengthy delay between the date of the crime and his indictment violated his right to a speedy trial. We disagree. The relevant factors which need to be assessed in evaluating a defendant's claim that he or she was denied the right to a speedy trial are (1) the extent of the delay, (2) the reasons for the delay, (3) the nature of the underlying charge, (4) whether there is any indication that the defense has been impaired by reason of the delay, and (5) whether there has been an extended period of pretrial incarceration (*see, People v Taranovich,* 37 NY2d 442, 445). No one factor or combination of factors is necessarily decisive; rather, the particular case must be considered in light of all of the applicable factors (*see, People v Taranovich, supra,* at 445). In the instant case, the 17-year delay between the date of the crime and the indictment does not, in and of itself, warrant dismissal of the indictment (*see, People v Jones,* 267 AD2d 250; *People v LaRocca,* 172 AD2d 628; *People v Hoff,* 110 AD2d 782).

The underlying charges in this case are two counts of murder in the second degree stemming from two homicides which occurred on April 11, 1981. The Legislature has specifically addressed the inherent seriousness of homicide, and the State's concurrent interest in seeking justice for such a crime, by not placing a Statute of Limitations on its prosecution (*see,* CPL 30.10 [2] [a]). Implicit in the determination not to place a Statute of Limitations on homicide is that a defendant's claim that he or she was denied the right to a speedy trial will be closely scrutinized.

The facts of this double homicide reveal a particular callous-

ness toward human life. A confrontation occurred in a tavern concerning a spilled drink. As the confrontation escalated, John D'Agnese, one of the tavern owners, tried to calm the parties down. Mr. D'Agnese asked one man to leave, which he did, vowing to return. He returned approximately 20 minutes later along with the defendant and a third man. According to the People, upon reentering the tavern, the defendant walked over to Mr. D'Agnese and shot him in the face at point-blank range, mortally wounding him. Richard Godkin, Mr. D'Agnese's partner, rushed over to assist Mr. D'Agnese. At that point it is alleged that one of the other two men shot Mr. Godkin at close range, killing him. Obviously, the nature of the underlying charges are particularly heinous (see, People v Balken, 269 AD2d 534).

A review of the testimony at the Singer hearing (see, People v Singer, 44 NY2d 241), reveals that the People's delay in prosecuting the defendant was based on a determination, made in good faith, that the prosecution could not go forward because witnesses were afraid to testify. Although, at the time of the shootings there were 20 to 25 patrons present in the tavern, detectives testified that most of them refused to become involved and denied being present. Only the bartender initially cooperated and he subsequently identified the defendant as someone known to him as "Pepe". Armed with the name Pepe, the detectives determined that Pepe frequented a local social club. Members of the police forensics unit took surveillance photos of persons habitually at the club. The bartender was able to point out Pepe in one of the photographs, but still could not provide a name. A second witness, Linda G., came forward and identified this defendant as one of the perpetrators after viewing the surveillance photograph, but also could not provide a name. Approximately one month after the murders, an FBI agent informed the detectives that he was familiar with someone named Pepe and provided them with a phone number and an address. Detectives went to that address and spoke with Jacqueline Settles. She told the detectives that Pepe was her husband and that he had left the vicinity. She refused to provide further assistance and the defendant was never observed at that residence during the investigation.

In April 1982 an indictment was handed down against the other two participants in the homicides, Ronnie Barlin and Frank Riccardi. Mr. Barlin was subsequently arrested and Mr. Riccardi remained at large. At a pretrial hearing held on May 3, 1983, Ms. G. recanted her identification of Mr. Barlin as one of the perpetrators. As a result the indictment was dismissed

upon Ms. G.'s recantation, and because the bartender could not be found and was therefore unable to testify. The prosecutor declined to go forward with further prosecutions in the absence of witnesses.

The record does not indicate any further action in the case until it was reviewed by Detective Thomas Mansfield of the "Cold Case Squad" in 1997. Detective Mansfield interviewed the bartender, who had again been located, and 10 to 12 other people who were present at the time of the shootings. He checked Department of Motor Vehicles records to try to locate the defendant, and acquired the defendant's photograph from the FBI. He placed the photo in an array and showed it to three of the witnesses who had been inside the tavern at the time of the shootings. At least two persons identified the defendant as one of the men responsible for the homicides and the person who shot Mr. D'Agnese.

The prosecutor's original determination not to proceed against the defendant because of the fear and reluctance to cooperate exhibited by the witnesses to these ruthless and cold-blooded murders, was clearly made in good faith. A decision to revisit this case after some of the fear had subsided was a reasonable one. This is borne out by the fact that the defendant was not identified as the actual gunman in the death of Mr. D'Agnese until the subsequent investigation. Therefore, we conclude that this good faith determination to defer prosecution of the defendant, in light of the circumstances, did not deprive the defendant of his right to a speedy trial (*see, People v Lesiuk*, 81 NY2d 485; *People v Balken, supra*).

Moreover, the defendant was not prejudiced by the delay. The defendant claims that he is prejudiced because a .38 caliber revolver which had been linked to these homicides is missing, as are several police reports. The absence of those items does not prejudice the defendant, rather, it serves to undermine the People's ability to prosecute the case. The absence of any credible showing of prejudice strongly militates against a finding that the defendant's due process rights have been abridged (*see, People v Balken, supra*; *People v Jones, supra*; *People v Jemerson*, 215 AD2d 692).

The defendant claims that the missing police reports place him at a tactical disadvantage. However, he asserts no rational basis for this contention. Unspecified claims that witnesses may have moved, or forgotten relevant material that those reports may have contained, do not constitute actual prejudice (*see, People v Lee*, 234 AD2d 140). There are a number of remedies available, short of dismissal, should it be determined

that certain reports are now unavailable (*see, People v Haupt,* 71 NY2d 929).

Further, the length of inactivity was not intended to give the prosecutor an unfair tactical advantage (*see, People v Jones, supra*). Contrary to the defendant's claim, the delay in this case places the prosecution, not the defendant, at a tactical disadvantage, because the delay may have served to erode the memories of the eyewitnesses. No rational view of the relevant factors leads to the conclusion that prosecution of the defendant was delayed in order for the People to gain a tactical advantage (*see also, People v Chilli,* 227 AD2d 103).

The period of pretrial incarceration is not relevant in this case because the defendant bases his due process claim only on the delay between the date of the crime and his indictment. In any event, the record reveals that the defendant was taken into custody on or about November 22, 1998, and arraigned on or about November 24, 1998. He subsequently posted an insurance company bond and was released from custody on January 21, 1999. The defendant's pretrial incarceration was neither a prolonged period of time, nor was it unreasonable (*see, People v Taranovich, supra*).

The length of delay between the date of the crime and the indictment charging the defendant with a double homicide did not deprive him of due process. Accordingly, the order is reversed, the motion is denied, the indictment is reinstated, and the matter is remitted to the Supreme Court, Queens County, for further proceedings on the indictment. Joy, J. P., Thompson and Smith, JJ., concur.

Florio, J., dissents and votes to affirm the order appealed from with the following memorandum in which Friedmann, J., concurs. I respectfully dissent. While I agree with the majority that the 17-year delay in this case does not, in and of itself, warrant dismissal of the indictment, it does shift the burden to the People to establish good cause for the delay (*see, People v Lesiuk,* 81 NY2d 485; *People v Singer,* 44 NY2d 241). In my opinion they failed to do so.

First, it is clear that the People were aware of the defendant's identity prior to their initial presentation of this matter to the Grand Jury in 1982, which resulted in an indictment against Frank Riccardi and Ronnie Barlin. In all probability, had the People presented the facts concerning the defendant to the Grand Jury, an indictment against him would have been secured. However, for unknown reasons the People crossed the defendant's name off their presentation memorandum.

Second, although it is not clear from the record of the *Singer*

hearing, it appears that the defendant has a New York State drivers license, and has been in the New York State Department of Motor Vehicles database for a not insignificant amount of time. However, there is no proof in the hearing record that the police actually searched this database for any record of him prior to 1997.

While it may be true, as the majority asserts, that there was a valid reason to wait some period of time to allow the fear surrounding this crime to dissipate, the People have failed to show why they waited over 16 years to reopen an investigation, which then took less than a year to complete. Furthermore, although it is clear that the bartender, one of the original witnesses who identified the defendant as a perpetrator, was interviewed both in 1981 and when the case was reopened, there is no statement from him indicating that he was afraid to testify in 1981. Finally, although the Grand Jury minutes of this case indicate that the defendant was one of the persons who had a gun in his hand, there is no statement by any Grand Jury witness to the effect that the defendant was the person who actually shot John D'Agnese in the face at point-blank range as the majority contends.

While a dismissal in this case might result in a guilty man going free, forcing the defendant to stand trial might require an innocent man to defend himself against accusations involving circumstances and actions which occurred almost two decades ago, when the evidence he may need is likely to have disappeared. Additionally, as is apparent from the Grand Jury testimony, proof of the defendant's guilt or innocence will depend upon witnesses whose memories have faded. Furthermore, it appears, based on the appellant's brief, that the People no longer contend that the defendant was one of the shooters. Considering the interest of society, as well as that of the defendant in assuring the prompt, fair prosecution and adjudication of those suspected of criminal activity (*see, People v Staley,* 41 NY2d 789), and since in my opinion, the People have failed to meet their burden of showing good cause for the delay (*see, People v Lesiuk, supra; People v Singer, supra*), I would affirm the dismissal of the indictment herein.