[716 NYS2d 718]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARVIN L. DENIS, Appellant.

Third Department, November 22, 2000

APPEARANCES OF COUNSEL

*Dershowitz, Eiger & Adelson,* New York City (*Nathan Z. Dershowitz* of counsel), for appellant.

*Richard D. Northrup, Jr., District Attorney* of Delaware County, Delhi, for respondent.

**OPINION OF THE COURT**

SPAIN, J.

On May 3, 1992 Rosemary Denis died after a fall off a cliff ledge at the top of Russell Brooks Falls in the Town of Colchester, Delaware County. A pool of water is located at the base of the falls. The victim and defendant, her husband, were there on an outing at the time. A subsequent autopsy revealed that the cause of the victim's death was drowning and not the injuries she sustained as a result of the fall. More than six years later—in September 1998—defendant was indicted on a single count of intentional murder in the second degree. The People's bill of particulars alleged that defendant intentionally caused the victim's death by drowning her. It was never determined what caused the victim's fall. After a jury trial in 1999 at which, among others, two witnesses testified to observing defendant holding the victim's body face down and under water in the pool of water at the base of the falls, defendant was convicted as charged and later sentenced to an indeterminate prison term of 25 years to life. On defendant's appeal he raises a number of issues, only some of which require our discussion and none of which warrant disturbing the judgment.

■ Defendant's principal contention is that the jury's verdict was not supported by legally sufficient evidence and he also argues that the verdict was contrary to the weight of the evidence. Specifically, defendant argues that the People failed to offer sufficient evidence that the victim was alive and had not already drowned at the time he is alleged to have reached her and held her underwater and, thus, they failed to prove that he caused or contributed to the victim's death. Defendant's motion to dismiss the charge at the close of the People's case preserved the issue for our review. Upon our review of the evidence in the light most favorable to the prosecution (*see, People v Williams*, 84 NY2d 925, 926; *People v Contes*, 60 NY2d 620, 621), we find that the trial evidence was legally sufficient to uphold the jury's determination that defendant intentionally caused his wife's death.

To sustain a conviction for intentional murder the People must establish, beyond a reasonable doubt, that defendant caused the death of the victim and that he did so intentionally (*see*, Penal Law §§ 125.00, 125.25 [1]; *People v Dlugash*, 41

NY2d 725, 731). Thus, the People were required to prove that defendant's conduct in holding his wife's head underwater was the actual, and a sufficiently direct, cause of her death by drowning, in that "it forged a link in the chain of causes which actually brought about the death" (*People v Stewart*, 40 NY2d 692, 697; *see, People v Dlugash, supra; People v Kibbe*, 35 NY2d 407, 412), as it would not have been murder for defendant to have held underwater the victim's dead body (*see, People v Dlugash, supra*, at 731).

An appellate court reviewing a challenge to the legal sufficiency of the trial evidence, including circumstantial evidence, must view the evidence in the light most favorable to the prosecution and determine whether any valid line of reasoning and permissible inferences could lead any rational person to the conclusion reached by the trier of fact on the basis of the evidence presented at trial (*see, People v Williams, supra; People v Bleakley*, 69 NY2d 490, 495; *People v Contes, supra*). At trial, the forensic pathologist who performed the autopsy testified that he determined that the cause of death was drowning, specifically "dry drowning" in which the victim suffered a laryngeal spasm due to exposure to water in her airway which closed off the airway, resulting in asphyxiation or lack of oxygen. He further stated that while the victim had sustained head and other injuries, these injuries occurred prior to her death and were not the cause of her death. He could not opine whether the victim was rendered unconscious by the trauma to her head. The pathologist also testified that it generally takes four minutes from the time a person's airway is obstructed until irreversible brain damage occurs and either brain death or cardiopulmonary arrest will result.

Defendant's medical expert, also a forensic pathologist, concurred that the cause of death was "dry drowning" and opined that the victim almost certainly sustained a concussion and was unconscious. He indicated that he could not rule out the possibility that the victim's death may in part have been caused by vagal reflex—caused by trauma to the vagus nerve which controls breathing and heart functioning—resulting in cardiac arrest. He opined that in over half of the cases, laryngeal spasms would begin to subside on their own if a person were removed from water and that CPR may revive a person experiencing such a spasm, although sometimes administration of medication or insertion of an endotracheal tube are necessary to break the spasm. While the People's pathologist opined that submersion in cold water tends to slow.

down the body's metabolism and death by drowning, defendant's pathologist opined that it would have increased the potential for a laryngeal spasm and could have hastened cardiac arrest.

Also providing key testimony at trial were two eyewitnesses, Anthony Gooler and Robert Nevelle, who had been fishing near the base of the waterfall at the time. Critically, both testified to hearing what they believed was a scream emanate from the top of the falls and to thereafter seeing defendant run by them in the direction of the pool at the base of the falls. Defendant glanced at them but did not ask for their help. They soon decided to look into what was going on and walked over to the base of the falls. Both testified to observing defendant kneeling or leaning over the victim in the water, using his arms to hold the victim face down by the shoulders with her head fully immersed in the water and that defendant was not attempting to give the victim CPR, to pull her out of the water or to move her. When defendant looked up and saw them, he immediately rolled the victim's body over, pulling her head out of the water without any apparent physical difficulty and only then did he yell for them to get help. Gooler left and summoned emergency help, while Nevelle remained at the scene and observed defendant—at Nevelle's suggestion—pull the victim's body from the water onto a flat rock, again without any apparent difficulty. Nevelle then left to meet emergency personnel. Testimony at trial established that the pool of water was approximately 12 to 18 inches deep.

The first emergency medical technician (hereinafter EMT) to arrive on the scene testified that when he approached the scene he observed defendant kneeling in the water looking down at the victim's body—which was again floating in the water—but not doing anything. When defendant looked up and saw him, he began making gestures or heart compressions as if performing CPR on the victim but he was not supporting her head, and her body was bobbing up and down as she was not on a hard surface as required to perform CPR compressions. Defendant asked for help and the EMT immediately pulled the victim from the water onto a rock—which was right next to the victim—which he testified required "not very much" effort on his part; the EMT determined that she had no pulse and was not breathing. Defendant walked away and said nothing further.

John Skinner, a State Police investigator assigned to this case, questioned defendant at the scene and later at the State

Police station where he obtained a written statement from defendant. He testified that defendant was "very upbeat," "smiling, talking" and was "very relaxed." Skinner also testified that defendant told him that after he and his wife took photographs together at the top of the falls overlook, defendant began walking down the path to take more pictures of the falls, leaving his wife at the overlook. When he was about three quarters of the way down he heard a scream, took another step or two, became nervous, dropped his camera tripod and ran back to the overlook but could not find his wife; he then looked over the ledge and saw her lying face down in the pool of water at the base of the falls, at which point he screamed and ran down the path to his wife. Defendant claimed that he had difficulty rolling her over in the water, performing CPR, dragging her to shore and removing her face from the water because she was heavy. This was essentially the same exculpatory account as appeared in defendant's written statement.

Defendant testified at trial providing the same general account of what occurred as he had given to the State Police. He testified that after observing his wife from the top of the cliff lying in the pool of water below, he ran as fast as he could down the path into the water but never saw anyone—not even the fishermen—along the path. Upon reaching her in the water, defendant removed her head from the water and tried to turn her over but he wasn't able to because the water was too shallow; he then pushed her into a deeper section, easily turned her over and slid her head and shoulders onto a flat rock. He attempted CPR—which he had been trained to do—by doing compressions and blowing air in her mouth but it would not go in, at which point he saw a man and yelled for help. Realizing he was not reviving her, defendant slid her back into the water, holding her face out of the water, based upon his belief the cold water would keep her from dying. Another man came by and defendant again asked for help; when defendant heard car doors slamming he assumed help was coming and again tried CPR, and then help arrived.

Defendant's central contention is that even crediting the testimony of the prosecution witnesses, the People failed to prove or rule out the possibility that the victim had not already drowned by the time he reached her and allegedly held her underwater. That is, defendant argues that the evidence did not demonstrate that he had sufficient time to descend the path adjacent to the falls and cause the victim's drowning (which drowning would have taken at least four minutes to ac-

complish). With regard to the timing, both Gooler and Nevelle testified that they were not wearing watches and could only guess at or estimate the intervals between hearing the scream, seeing defendant run by and observing defendant holding the victim underwater. Nevelle testified that defendant ran past them only "a few moments" after the scream, while Gooler estimated it was 5 to 7 minutes after the scream. Nevelle estimated that they continued to fish for approximately five minutes and then walked in the direction of the base of the falls to ascertain whether someone needed help; Gooler did not estimate how long the two waited to investigate after seeing defendant run by.* Three days after the victim's death, during Skinner's questioning at defendant's home, defendant estimated that it had only taken him "around 20 seconds" to run down the path from the top of the overlook to get to his wife and denied ever seeing the fishermen on his way down.

According the prosecution the benefit of every reasonable, favorable inference from the foregoing testimony, we conclude that the People proved beyond a reasonable doubt that defendant caused his wife's death by drowning (*see, People v Ford,* 66 NY2d 428, 437; *People v Malizia,* 62 NY2d 755, *cert denied* 469 US 932; *see also, People v Cicchetti,* 44 NY2d 803). Indeed, the People's proof of a causal connection was not obscure or "contingent, speculative, or merely possible" (*Matter of Burris v Lewis,* 2 NY2d 323, 327 [internal quotations omitted]; *see, People v Stewart,* 40 NY2d 692, 697, *supra*; *People v Brengard,* 265 NY 100; *cf., People v King,* 265 AD2d 678, *lv denied* 94 NY2d 904) and—contrary to the supposition underlying defendant's sufficiency claims—"absolute certainty and the exclusion of every other possibility [are not] required" (*Matter of Anthony M.,* 63 NY2d 270, 280-281). Moreover, defendant's acts need not have been the sole cause of death but, rather, need only have been an actual contributory cause of death that forged a link in the chain of causes which actually brought about her death (*see, People v Stewart, supra,* at 697; *see also, Matter of Anthony M., supra,* at 280).

Here, viewed most favorably to the prosecution, the evidence established that for reasons not established at trial, the victim fell from the cliff ledge and, a short time later, defendant was

---

* In his first statement to police on May 3, 1992 and again in 1995, Nevelle estimated this time interval as five minutes and in his second statement on May 3, 1992 as 8 to 10 minutes. In Gooler's 1992 written statements to police he estimated the interval as 5 to 8 minutes and in his 1995 statement as "several minutes."

observed at the base of the falls holding her face down underwater. A few moments after the fishermen heard a scream, they observed defendant running in the direction of the base of the falls, providing sufficient proof of defendant's arrival at the pool in time to hold the victim underwater and cause her death by drowning, i.e., within four minutes of her fall. The fact that Nevelle roughly estimated at trial that he and Gooler continued to fish for approximately five minutes after observing defendant run by before investigating and discovering defendant holding the victim underwater did not undermine the circumstantial evidence of defendant's arrival at the pool and his opportunity to drown the victim within minutes of her fall. Indeed, defendant himself estimated only days after the fatality that it took him only 20 seconds to descend the path from the top and reach her in the water.

Contrary to defendant's implicit contention, the People—to satisfy their burden of proof—were not required to produce eyewitness accounts or other direct testimony that the victim was seen alive just prior to defendant holding her underwater or at the time the fishermen observed him doing so, or precise time measurements of the time intervals between witnesses' various observations. In fact, the People were entitled to rely on the combination of, *inter alia*, the circumstantial proof that defendant was observed running to the victim within "a few moments" of the scream and the direct evidence that he held her face down underwater and that the cause of her death was, in fact, drowning. The People's proof was sufficient to show that defendant actually and intentionally contributed to the victim's drowning death by holding her head underwater (*see, People v Dlugash*, 41 NY2d 725, 731, *supra*; *People v Stewart, supra*, at 697; *see also, People v Cicchetti*, 44 NY2d 803, *supra*).

Defendant's contention that the verdict was against the weight of the evidence focuses on alleged shortcomings in the evidence of causation and on the credibility of the eyewitnesses, Gooler and Nevelle. Viewing the evidence in a neutral light and making our own independent determination of the relative probative force of the conflicting testimony and the relative strength of conflicting inferences that may be drawn from the evidence presented, we are satisfied that the jury gave the evidence the weight it should be accorded (*see, People v Bleakley*, 69 NY2d 490, 495, *supra*).

To this end, defendant focuses on what he characterizes as "changing stories" between the fishermen's 1999 trial testimony and their statements to police on the day of the victim's 1992

drowning and in 1995. However, a comparison of these statements reveals no significant, substantive variations that cast serious doubt upon their trial testimony. Both testified at trial to seeing defendant holding the face-down victim by the shoulders underwater, with her head fully immersed in the water until defendant saw them. In Gooler's first very brief statement transcribed by police shortly after the drowning he, *inter alia*, described seeing "a man bent over a woman" and that the man, upon seeing the fishermen, "turned her over taking her head and face out of the water." In a longer statement later that day—which was typed in question and answer format—Gooler indicated, *inter alia*, that he saw a man "holding onto a body face-down in the water," "standing on the side of her with his hands on her" and the witness "couldn't see her head. * * * It was underwater." He could not remember where defendant's hands were on the victim's body. In a 1995 question and answer written statement, Gooler indicated that he saw the man who had run by him "standing over [straddling] a woman in the water. He had his hands around her neck or shoulder area, holding her face-down in the water."

Similarly, Nevelle's first brief statement transcribed by police shortly after the drowning states that he saw "a man bent over the woman with her [*sic*] hands on her shoulders. When he saw us he turned her over, face-up and called for help." Later that day, Nevelle provided a longer statement in question and answer format in which he indicated that he "came upon the man standing over what appeared to be a body * * * face-down in the water. The man appeared to be holding the body with both hands on the shoulders. At that point, the man looked up at my direction, repeatedly yelled 'help' and turned the body face-up." Nevelle's 1995 statement essentially stated the same. Thus, Nevelle and Gooler's trial testimony as to their observations of defendant holding the victim face down with her face underwater was neither materially different from nor inconsistent with their prior statements. Further, the variations in their descriptions, which consisted mostly of omissions, were fully explored on cross-examination and it was primarily a function for the jury—having observed their demeanor at trial—to assess their credibility and determine whether to credit their trial testimony and how to resolve any conflicting evidence, whether direct or circumstantial (*see, People v Ford*, 66 NY2d 428, 437, *supra*; *People v Francis*, 153 AD2d 901, 902, *lv denied* 75 NY2d 813).

Further, we do not find the testimony of Gooler and Nevelle to be incredible or illogical as defendant contends, despite trial

evidence of Nevelle's criminal history and Gooler's two incidents of driving while under the influence of alcohol. That defendant chose to drown his wife in a public park after passing potential witnesses and that the witnesses did not immediately intervene when they came upon defendant holding a lifeless body underwater are not unbelievable events. Further, the jury was certainly entitled to reject or discredit the whole of defendant's exculpatory testimonial account of what transpired at the time of his wife's death, particularly in view of the testimony recounting the numerous versions defendant has given of what transpired that day, as well as the two consistent eyewitness accounts of defendant's homicidal conduct (*see, People v Ford, supra; People v Kennedy*, 47 NY2d 196, 201, 203-204).

The jurors had the opportunity to view defendant and the other witnesses and hear their conflicting testimony, and we accord great deference to their determination which is fully supported by the record (*see, People v Bleakley*, 69 NY2d 490, *supra; People v Ford, supra; People v Gaimari*, 176 NY 84, 94; *People v Francis, supra*, at 902). Viewing the trial testimony as a whole, defendant's accounts of not being able to turn the victim over, move her or even to remove her face from the water were not particularly believable, and the jury was entitled to reject as incredible his testimony that he resubmerged the victim into the water in the belief that the icy water would slow down the process of her asphyxiation. Moreover, the People produced compelling evidence of defendant's motive with regard to his extramarital relationship in and before 1992 with a woman he later married, $80,000 worth of life insurance proceeds and his subsequent nongrieving or pretend grieving behavior at the scene, to police and around his children. Viewed as a whole, the jury's guilty verdict is not contrary to the weight of the credible evidence.

■ We next conclude that County Court properly denied as untimely defendant's CPL 330.30 motion to set aside the verdict which was based upon defendant's claim that his constitutional due process rights were violated by the People's six-year delay in obtaining an indictment. While defendant made an omnibus motion prior to trial pursuant to, *inter alia*, CPL article 210, he never moved prior to trial—as required—to dismiss the indictment upon speedy trial or due process grounds relating to the preindictment delay (*see*, CPL 30.20, 210.20 [1] [g], [h], [i]; [2] [motion pursuant to CPL 210.20 (1) (g) "must be made prior to the commencement of trial or entry

of a plea of guilty"]; *see also*, CPL 255.10 [1] [a]). Indeed, defendant did not assert this claim of preindictment delay until after the jury returned its guilty verdict, raising it for the first time in a postverdict motion challenging the verdict pursuant to CPL 330.30; as such, the motion was clearly untimely and correctly denied (*see, People v Ramirez*, 243 AD2d 734, *lvs denied* 91 NY2d 878, 929; *see also*, CPL 210.20 [2]; *People v Lawrence*, 64 NY2d 200, 203-204; *People v Pitcher*, 182 AD2d 878, *lv denied* 80 NY2d 933; Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 30.20, at 151-155).

While it is true that a waiver of appeal is ineffective to the extent that it precludes appellate review of constitutional speedy trial claims and such claims survive a guilty plea following the denial of such a motion (*see, People v Callahan*, 80 NY2d 273, 281-282; *People v Seaberg*, 74 NY2d 1; *People v Blakley*, 34 NY2d 311, 313), even a properly interposed constitutional claim may be deemed abandoned or waived if not pursued (*see, People v Rodriguez*, 50 NY2d 553; *see also, People v Callahan, supra; People v Marrero*, 259 AD2d 836, *lv denied* 93 NY2d 927; *People v Love*, 236 AD2d 488, *lv denied* 90 NY2d 895) and—as also with statutory speedy trial claims—the complete failure to make a pretrial motion to dismiss based upon the alleged due process abridgement caused by the preindictment delay waives this unpreserved claim (*see, People v Lawrence, supra; People v Ramirez, supra; People v Ferguson*, 192 AD2d 800, *lv denied* 82 NY2d 717; *People v Pitcher, supra; People v Zambito*, 153 AD2d 975; *see also*, CPL 30.20, 210.20 [1] [g]; [2]; *People v Hudson*, 205 AD2d 367, *lv denied* 84 NY2d 827; *People v Jordan*, 96 AD2d 1060, *affd* 62 NY2d 825). Defendant's claim that he had to await the People's presentation of their case at trial in order to formulate his due-process-based motion is unavailing, patently incorrect and rejected, as the issue was readily capable of review in a pretrial hearing and, moreover, defendant did not even raise this issue at the close of the People's proof.

In any event, even if defendant's motion was deemed to have been timely and proper, we would conclude that under the circumstances of this case, the six-year delay in obtaining this indictment, while lengthy, did not violate defendant's constitutional right to due process of law (*see, People v Singer*, 44 NY2d 241, 253-255; *People v Taranovich*, 37 NY2d 442, 445). Here, the record reflects that in 1992 the then-District Attorney who, in representing the State, was vested with broad discretion to

investigate and prosecute criminal charges (*see, People v Zimmer*, 51 NY2d 390, 394) did not pursue an indictment against defendant for this murder, apparently perceiving that there was insufficient evidence to obtain a conviction. It has been widely recognized that "[d]elays due to difficulty in obtaining sufficient evidence to indict or even to arrest do not mandate dismissal of charges [on due process grounds]" (*People v Staley*, 41 NY2d 789, 792; *see, People v LaRocca*, 172 AD2d 628, *lvs denied* 78 NY2d 923, 968; *People v Papa*, 143 AD2d 1058, 1059; *People v Quince*, 119 AD2d 981, *lv denied* 68 NY2d 671) and that "a determination made in good faith to defer commencement of the prosecution for further investigation * * * will not deprive the defendant of due process of law even though the delay may cause some prejudice to the defense" (*People v Singer, supra*, at 254; *see also, United States v Lovasco*, 431 US 783, 795-796; *People v Lesiuk*, 81 NY2d 485; *People v Balken*, 269 AD2d 534; *People v Mangan*, 258 AD2d 819, *lv denied* 93 NY2d 927; *People v Torres*, 257 AD2d 772, 773, *lv denied* 93 NY2d 903; *People v Rosado*, 166 AD2d 544, *lv denied* 77 NY2d 843; *People v Frazier*, 159 AD2d 1017, *lv denied* 76 NY2d 734, *cert denied* 498 US 873).

The fact that six years later the newly elected District Attorney, after reviewing the evidence and assessing the witnesses' credibility, decided to pursue an indictment of defendant on the basis of evidence which was largely available years earlier does not alter our analysis or our conclusion in this case; the inherently discretionary and subjective prosecutorial determination of what constituted sufficient evidence to successfully prosecute defendant justified the delay. Moreover, there is no evidence to suggest that the delay here was "a deliberate attempt by the prosecution to hamper [defendant] in the preparation of his defense" (*People v Taranovich, supra*, at 446; *see, People v Tomaino*, 248 AD2d 944, 945) or motivated by a desire to gain an unfair tactical advantage (*see, People v Jones*, 267 AD2d 250, *lv denied* 94 NY2d 949). Further, while the six-plus year delay was lengthy, the Court of Appeals has "steadfastly refused to set forth a per se period beyond which a criminal prosecution may not be pursued" (*People v Taranovich, supra*, at 445) and, in recognition of the grave nature of the crime of murder (*see, People v Jackson*, 178 AD2d 305, 306, *lv denied* 79 NY2d 948; *People v Romero*, 173 AD2d 654, *lv denied* 78 NY2d 1014), a "District Attorney may be expected to proceed with far more caution and deliberation" (*People v Taranovich, supra*, at 446). Notably, lengthy delays in obtaining indict-

ments against defendants charging murder and manslaughter have been held not to violate due process principles where, as here, good cause or justification for the prosecutorial delay is demonstrated (*see, People v Vernace*, 274 AD2d 595 [17-year delay]; *People v Tomaino, supra* [56-month delay]; *People v Brown*, 209 AD2d 233, *lv denied* 85 NY2d 860 [nine-year delay]; *People v LaRocca*, 172 AD2d 628, *supra* [17-year delay]; *People v Frazier, supra* [11-year delay]).

We next conclude that defendant's generalized contentions that the delay in prosecuting him substantially impaired his defense are not supported by the record. While defendant is correct that a lengthy delay in the commencement of an action without good cause may entitle defendant to a dismissal of an indictment on State constitutional due process grounds even in the absence of prejudice to defendant (*see, People v Singer*, 44 NY2d 241, 254, *supra; People v Staley*, 41 NY2d 789, 792, *supra; see also, People v Lesiuk*, 81 NY2d 485, 490, *supra; People v Fuller*, 57 NY2d 152, 159; *People v Townsend*, 270 AD2d 720; *People v Gallup*, 224 AD2d 838), the record fully supports the conclusion that the delay was justified (*see, People v Lesiuk, supra*, at 490; *People v Staley, supra*, at 792; *People v Vernace, supra; People v Balken*, 269 AD2d 534, *supra; People v Mangan*, 258 AD2d 819, *supra; People v Torres*, 257 AD2d 772, *supra; People v Brown, supra; People v LaRocca, supra; People v Rosado*, 166 AD2d 544, *supra; People v Frazier*, 159 AD2d 1017, *supra; cf., People v Townsend, supra*). Indeed, the absence of demonstrable impairment to the defense attributable to the delay is a relevant consideration militating against defendant's due process abridgement claims (*see, People v Taranovich, supra*, at 446; *see also, People v Fuller, supra*, at 160; *People v Vernace, supra*, at 597; *People v Balken, supra; People v Allah*, 264 AD2d 902, 902-903; *People v Tomaino*, 248 AD2d 944, 945, *supra; People v Brown, supra*, at 233; *People v LaRocca, supra*, at 628; *People v Romero, supra*, at 654; *People v Rosado, supra*, at 544-545). Defendant was not incarcerated at any time prior to this prosecution and from the outset he was acutely aware that he was a suspect, and thus he was not disadvantaged in the preparation of his defense in this regard (*see, People v Taranovich, supra*, at 445-446).

We also find unpersuasive defendant's claim that the death of the County Coroner who had signed the victim's death certificate—but who did not perform the autopsy—denominating the manner of her death as "accidental * * * pending the autopsy report" impaired his defense, and likewise reject as

baseless his generalized contention that the delay hindered his ability to investigate and present witnesses on the key issue of the medical cause of death. Indeed, defendant presented the testimony of a pathologist who reviewed the autopsy report, photographs and other evidence and concurred with the conclusion of the People's pathologist who performed the autopsy that the victim had died from dry drowning and, thus, the medical cause of the victim's death was not in dispute. While it was controverted whether the victim died as a consequence of defendant's action or otherwise, defendant made no showing that there were or could have been other potential witnesses or evidence on this key issue.

We have examined defendant's remaining contentions, including his allegations of prosecutorial misconduct and an improper jury charge, and find that they lack any merit.

CARDONA, P. J., MERCURE, CARPINELLO and GRAFFEO, JJ., concur.

Ordered that the judgment is affirmed.